UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TENNESSEE, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.: 3:16-cv-02380 |
| v. | ) ) | |
| | ) | JUDGE BERG |
| VANGUARD HEALTHCARE, LLC, | ) | MAGISTRATE JUDGE NEWBERN |
| VANGUARD HEALTHCARE SERVICES, LLC, | ) | |
| BOULEVARD TERRACE, LLC, VANGUARD | ) | |
| OF CRESTVIEW, LLC, GLEN OAKS, LLC, | ) | JURY DEMAND |
| IMPERIAL GARDENS HEALTH AND | ) | |
| REHABILITATION, LLC, VANGUARD OF | ) | |
| MEMPHIS, LLC, VANGUARD OF | ) | |
| MANCHESTER, LLC, WILLIAM ORAND and | ) | |
| MARK MILLER, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' AND THE STATE OF TENNESSEE'S AMENDED COMPLAINT**

INTRODUCTION

1.      The United States of America and the State of Tennessee bring this action pursuant

to the False Claims Act (FCA), 31 U.S.C. §§ 3729 to 3733, the Tennessee Medicaid False Claims

Act (TMFCA), Tenn. Code Ann. § 71-5-181 to -185, and common law theories of payment by

mistake and unjust enrichment, against Defendants Vanguard Healthcare, LLC (Vanguard Parent),

Vanguard Healthcare Services, LLC (Vanguard Corporate), Boulevard Terrace, LLC, Vanguard

of Crestview, LLC, Glen Oaks, LLC, Imperial Gardens Health and Rehabilitation, LLC, Vanguard

of Memphis, LLC, Vanguard of Manchester, LLC (collectively Vanguard Defendants), and Mark

Miller (Miller).  The United States and Tennessee also bring this action against William Orand

(Orand) for unjust enrichment and payment by mistake.  The Vanguard Defendants, Miller, and

Orand shall hereinafter be referred to as "the Defendants."

2.     This action arises from Defendants' provision of non-existent, grossly substandard, and/or worthless nursing home services to Medicare and TennCare beneficiaries from January 1, 2010 to December 31, 2015 at Crestview Health and Rehabilitation (Crestview) in Nashville, Tennessee, at Glen Oaks Health and Rehabilitation (Glen Oaks) in Shelbyville, Tennessee, and at Poplar Point Health and Rehabilitation (Poplar Point) in Memphis, Tennessee; from January 1, 2010 to April 31, 2013 at Imperial Gardens Health and Rehabilitation, LLC (Imperial) in Madison, Tennessee; and from January 1, 2011 to December 31, 2015 at Boulevard Terrace Rehabilitation and Nursing Center (Boulevard) in Murfreesboro, Tennessee (collectively Grossly Substandard Defendant Facilities), which caused serious physical and emotional harm to highly vulnerable elderly, disabled and low income residents at these facilities.

3.     Orand – as the owner and ultimate decision-maker for all of the Vanguard companies, and Miller – as a salaried Vanguard employee who was closely involved with and tied to Vanguard's fraudulent conduct – were unjustly enriched as a result of Vanguard's conduct, and their knowing retention of those monetary benefits would be inequitable under those circumstances.

4.     This action also arises from the Defendants' submission, or causing the submission, of Pre-Admission Evaluations (PAEs) and Preadmission Screening and Resident Reviews (PASRRs) with forged *physician* signatures to TennCare from at least December 4, 2012 through April 30, 2014 at Boulevard, Glen Oaks, Poplar Point, and Manchester Health Care Center (Manchester) (collectively Physician Forgery Defendant Facilities) and of PAEs with forged *nurse* signatures to TennCare at Imperial from September 20, 2012 through February 13, 2013.

5.     Defendants made, or caused to be made, false or fraudulent claims to TennCare, the joint federal-state Tennessee Medicaid program, and the federal Medicare program for (a) non-

existent, grossly substandard, and/or worthless nursing home services and (b) nursing home services that were non-reimbursable due to the submission of forged PAEs and/or PASRRs. Moreover, Defendants made false or fraudulent representations and certifications material to such claims, in violation of the FCA, the TMFCA, and the common law.

6. The United States and Tennessee suffered millions of dollars in damages when Medicare and TennCare paid Defendants for such false or fraudulent claims.

JURISDICTION AND VENUE

7. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, 1367(a), 31 U.S.C. §§ 3730, 3732, and Tenn. Code. Ann. § 71-5-183(a).

8. Venue lies in this district under 28 U.S.C. §§ 1391 and 1395(a), and 31 U.S.C. § 3732(a), because all Defendants reside in or operate in Tennessee and because a substantial part of the events or omissions giving rise to the acts alleged in this complaint occurred in the Middle District of Tennessee.

9. The Court has jurisdiction over Defendants based upon their transaction of business within this judicial district and pursuant to 31 U.S.C. § 3730, permitting suit under the FCA in any judicial district in which a defendant or, in the case of multiple defendants, any one defendant, can be found, resides, transacts business, or in any judicial district in which any act proscribed by 31 U.S.C. § 3729 occurred.

10. The causes of action alleged in this complaint are timely brought within the applicable statutes of limitations due to: (a) the dates of Defendants' actions; (b) the dates when the relevant claims were paid; and (c) tolling agreements executed by eight of the Defendants.

11.     Specifically, the earliest dates when Medicare and TennCare paid any of the false claims at Imperial, Crestview, Glen Oaks, and Poplar Point in this case are as follows:

| Facility | Dates of Service for False Claims | Date of 1st Medicare Payment of False Claims | Date of 1st TennCare Payment of False Claims |
|---|---|---|---|
| Imperial | 1/1/10 – 4/30/13 | 2/23/10 | 1/22/10 |
| Crestview | 1/10/10 – 12/31/15 | 2/19/10 | 2/12/10 |
| Glen Oaks | 1/1/10 – 12/31/15 | 2/22/10 | 2/5/10 |
| Poplar Point | 1/1/10 – 12/31/15 | 2/22/10 | 1/22/10 |

12.     Therefore, the relevant statute of limitations in this case (for the earliest false claims made in the applicable date range) did not expire until, at the earliest, the following dates:

| Facility | Medicare | TennCare |
|---|---|---|
| Imperial | 2/22/16 | 1/21/16 |
| Crestview | 2/18/16 | 2/11/16 |
| Glen Oaks | 2/21/16 | 2/4/16 |
| Poplar Point | 2/21/16 | 1/21/16 |

13.     Prior to the above dates, however, Defendants Vanguard Corporate, Boulevard Terrace, LLC, Vanguard of Crestview, LLC, Glen Oaks, LLC, Imperial Gardens Health and Rehabilitation, LLC, Vanguard of Memphis, LLC, and Vanguard of Manchester, LLC, entered into three separate tolling agreements with the United States that tolled the statute of limitations for causes of action under the FCA, the TMFCA, and common law for the following time periods: (a) October 1, 2015 through March 31, 2016, (b) March 31, 2016 through July 1, 2016, and (c) July 22, 2016 through October 22, 2016.

4

14.     In addition, Vanguard Parent entered into two separate tolling agreements that tolled the statutes of limitations for causes of action under the FCA, the TMFCA, and common law for the following time periods: (a) April 26, 2016 through July 1, 2016 and (b) July 22, 2016 through October 22, 2016.

15.     Orand did not enter into a tolling agreement. As the United States and Tennessee are only bringing common law claims against him for the period from June 1, 2011 through December 31, 2015, such claims against him are all timely brought.

PARTIES

16.     Plaintiff United States brings this action on behalf of the Department of Health and Human Services ("HHS") and its operating division, the Centers for Medicare & Medicaid Services ("CMS"), for losses that the United States incurred under the Medicare program and the TennCare program. At all times relevant to this action, the United States provided approximately 65 percent of the funds paid by the TennCare program to providers.

17.     Plaintiff Tennessee brings this action on behalf of its State Medicaid Program, known as TennCare.

18.     Defendant Vanguard Parent is, or at all times relevant to this action was, a closely-held, Tennessee limited liability company headquartered at Six Cadillac Drive in Brentwood, Tennessee (Vanguard Brentwood Headquarters). Vanguard Parent is the parent entity/holding company that wholly owns or owned a chain of 14 long-term care/nursing home providers in four states, including Boulevard, Crestview, Glen Oaks, Imperial, Manchester, and Poplar Point in Tennessee (collectively the Defendant Facilities). Vanguard Parent also wholly owns scores of other subsidiaries, including (a) Vanguard Financial Services, LLC (Vanguard Financial), which provides accounting and central business office services, including all Medicare and TennCare

5

billing, for the Defendant Facilities, does not work for non-Vanguard related entities, and is also located at Vanguard Brentwood Headquarters, (b) Elderscript Services, LLC (Elderscript), a closed door pharmacy that exclusively provides medications to the Vanguard skilled nursing homes, has its principal office address at Vanguard Brentwood Headquarters, and at all material times had either all or the vast majority of its clients as Vanguard skilled nursing facilities, (c) numerous Vanguard management companies that manage the Vanguard skilled nursing facilities and share a principal office address at Vanguard Brentwood Headquarters, and (d) approximately ten Vanguard property companies that own the property for certain Vanguard skilled nursing facilities and share a principal office address at Vanguard Brentwood Headquarters (collectively Vanguard subsidiaries).

19.     Vanguard Parent sits atop the corporate and organizational structure of its subsidiaries and through them controlled the Defendant Facilities.  Orand is the founding majority owner and Chief Executive Officer (CEO) of Vanguard Parent, and Jere Ervin is the founding minority owner and Executive Vice President.  Orand directly owns 54 percent of Vanguard Parent's stock.  Orand Limited Partnership owns another six percent of Vanguard Parent and was also a founding owner.  The general partners of Orand Limited Partnership are Orand and his wife and two children.  Ervin General Partnership owns the remaining 40 percent of Vanguard Parent. Ervin General Partnership is a general partnership that consists of two or three trusts that benefit Ervin and his children.

20.     Defendant Vanguard Parent constitutes an alter ego of its subsidiary Defendant Facilities and of Vanguard Corporate.  Vanguard Parent CEO Orand served as the CEO and President of all of the Defendant Facilities, of Vanguard Corporate, and of all of the Vanguard subsidiaries.  The Vanguard entities file a consolidated tax return and consolidated their financial

statements. Medicare and TennCare payments to the Defendant Facilities went into their individual bank accounts and were then automatically and daily swept into a concentration bank account held by Vanguard Financial. Those bank funds were then automatically swept into another bank account dedicated to paying off Vanguard debt owed to Capitol One. The Defendant Facilities, along with Vanguard Parent and Vanguard Corporate, are all cross-collateralized on the Capitol One debt, such that they are jointly responsible for that loan debt. Orand signed the Capitol One closing loan documents on behalf of each of these Vanguard entities, including the Defendant Facilities. The Vanguard entities were undercapitalized or grossly undercapitalized from 2013 forward. The inability of Vanguard Parent and its subsidiaries, including Vanguard Defendants, to make timely payments on the Capital One loan led them to file for Chapter 11 bankruptcy protection in 2016. Vanguard Parent used the Defendant Facilities as an instrumentality or business conduit and controlled their assets for the benefit of Vanguard Parent. It would promote injustice if Vanguard Parent were not found to be responsible as an alter ego of the Defendant Facilities and of Vanguard Corporate.

21.     Defendant Vanguard Corporate is, or at all times relevant to this action was, a Tennessee limited liability company headquartered at Vanguard Brentwood Headquarters. Vanguard Corporate is a wholly-owned subsidiary of Vanguard Parent. Vanguard Corporate provides policies and procedures and operational, paymaster, and home office support services to Vanguard Parent's skilled nursing facilities and all of the corporate-level Vanguard employees working for the Vanguard management companies or for the Vanguard skilled nursing facilities. Orand is the CEO of Vanguard Corporate. Vanguard Corporate receives a licensing fee from the Vanguard skilled nursing facilities. Along with and through its alter ego Vanguard Parent, Vanguard Corporate exercised control over the Defendant Facilities through their budgets,

staffing, and decision-making. Vanguard Parent, Vanguard Corporate, and the other Vanguard subsidiaries working out of Vanguard Brentwood Headquarters moved high level employees among the Vanguard subsidiaries, including moving Administrators and Directors of Nursing from one Vanguard skilled nursing facility to another and moving high level employees at Vanguard Brentwood headquarters to serve as an Administrator at Vanguard Defendant facilities.

22. Defendant Vanguard Corporate constitutes an alter ego of the Defendant Facilities. In conjunction with Vanguard Parent, Vanguard Corporate ran the Defendant Facilities as an instrumentality or business conduit and controlled their assets for the benefit of Vanguard Parent. If Vanguard Corporate were not found to be responsible as an alter ego, it would promote injustice.

23. Defendant Orand is the chief founder, majority shareholder, and the CEO of Vanguard Parent, Vanguard Corporate, Vanguard Defendant Facilities, and all other Vanguard subsidiaries, including Elderscript and Vanguard Financial Services. Orand has served in this CEO role for these entities from at least January 1, 2010 through the present and, upon information and belief, from the founding date of all of the Vanguard companies through the present.

24. Defendant Boulevard Terrace, LLC, is a Tennessee limited liability company and a wholly-owned subsidiary of Vanguard Parent. Orand is the CEO and President of Boulevard, Terrace, LLC, which operates and has operated Boulevard since January 1, 2011. Boulevard is a long-term care facility that participated in the TennCare and Medicare programs during the relevant period. Boulevard is managed by Murfreesboro Management Associates, LLC, a wholly owned subsidiary of Vanguard Parent. Boulevard Terrace, LLC's principal office address is at Vanguard Brentwood Headquarters.

25. Defendant Vanguard of Crestview, LLC (Crestview), is a Tennessee limited liability company and a wholly-owned subsidiary of Vanguard Parent. Up until the 2016 sale of

Crestview, Orand was the CEO and President of Vanguard of Crestview, LLC, which operates Crestview, a long-term care facility that participated in the TennCare and Medicare programs during the relevant period. Crestview is managed by Nashville Management Associates, LLC, a wholly-owned subsidiary of Vanguard Parent. Vanguard of Crestview, LLC's principal office address was at Vanguard Brentwood Headquarters.

26. Defendant Glen Oaks, LLC, is a Tennessee limited liability company and a wholly-owned subsidiary of Vanguard Parent. Orand is the CEO and President of Glen Oaks, LLC, which operates Glen Oaks, a long-term care facility that participated in the TennCare and Medicare programs during the relevant period. Glen Oaks is managed by Middle Tennessee Management Associates, LLC, a wholly-owned subsidiary of Vanguard Parent. Glen Oaks, LLC's principal office address is at Vanguard Brentwood Headquarters.

27. Defendant Imperial Gardens Health and Rehabilitation, LLC, is a Tennessee limited liability company that was previously known as Imperial Manor Convalescent Center, LLC. Orand is the CEO and President of Imperial Gardens Health and Rehabilitation, LLC, a wholly-owned subsidiary of Vanguard Parent that previously operated Imperial, a long-term care facility that participated in the TennCare and Medicare programs during relevant periods. Imperial closed in April 2013 and no longer operates. Imperial Gardens Health and Rehabilitation, LLC's principal office address is at Vanguard Brentwood Headquarters.

28. Defendant Vanguard of Manchester, LLC, is a Tennessee limited liability company and a wholly-owned subsidiary of Vanguard Parent. Orand is the CEO and President of Vanguard of Manchester, LLC, which operates Manchester, a long-term care facility that participated in the TennCare and Medicare programs during the relevant period. Manchester is managed by

Manchester Properties 2010, LLC, a wholly-owned subsidiary of Vanguard Parent. Vanguard of Manchester, LLC's principal office address is at Vanguard Brentwood Headquarters.

29.     Defendant Vanguard of Memphis, LLC, is a Tennessee limited liability company and a wholly-owned subsidiary of Vanguard Parent. Orand is the CEO and President of Vanguard of Memphis, LLC, which operates Poplar Point, a long-term care facility that participated in the TennCare and Medicare programs during the relevant period. Poplar Point is managed by West Tennessee Management Associates, LLC, a wholly-owned subsidiary of Vanguard Parent. Vanguard of Memphis, LLC's principal office address is at Vanguard Brentwood Headquarters.

30.     Defendant Miller is an individual residing in Tennessee who served as Director of Operations for Vanguard Corporate and Vanguard Financial from September 2011 through August 2014, a role in which he oversaw all of Vanguard's long-term care facilities.

DEFENDANTS' OPERATION OF THE DEFENDANT<br>FACILITIES AS TENNCARE AND MEDICARE PROVIDERS

31.     From at least January 1, 2010 through approximately April 30, 2013, Vanguard Parent and Vanguard Corporate operated and controlled Imperial, an approximately 165-bed facility.

32.     From at least January 1, 2010 through at least December 31, 2015, Vanguard Parent and Vanguard Corporate operated and controlled Crestview, a 111-bed facility; Glen Oaks, a 130-bed facility; Manchester, a 120-bed facility; and Poplar Point, a 169-bed facility.

33.     From January 1, 2011 through at least December 31, 2015, Defendants Vanguard Parent and Vanguard Corporate operated and controlled Boulevard, a 100-bed facility.

34.     Vanguard Parent and Vanguard Corporate exerted centralized control over all of the Defendant Facilities, including Defendant Facilities' admissions, budgets, and finances and thus controlled the funds available to operate these facilities and to provide the required bundle of

essential nursing home goods and services that were made available for the care of residents of the Defendant Facilities.

35.     Vanguard Parent and Vanguard Corporate caused the Defendant Facilities to enter into provider agreements with Medicare and TennCare private managed care contractors (MCCs), to execute other documents necessary for the Defendant Facilities to participate in Medicare and TennCare, and to take such other steps and execute such other documents as were necessary for the Defendant Facilities to conduct business and receive payments as a Medicare and TennCare provider.

36.     Vanguard Parent CEO Orand, President Scott Burleyson, or Secretary/Treasurer Kirk Hebert either personally signed, or caused other Vanguard agents to sign, TennCare MCC and Medicare Provider Agreements on behalf of the Defendant Facilities.

37.     The Defendant Facilities' Medicare Provider Agreements contained the following certification: "I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punishable by criminal, civil or administrative penalties."

38.     TennCare has three MCCs that provide services to eligible TennCare beneficiaries who receive long-term care services: Amerigroup Community Care, United Healthcare Plan of the River Valley, Inc., and BlueCross BlueShield of Tennessee.

39.     Boulevard's, Crestview's, Glen Oaks', and Manchester's provider agreements with TennCare MCC Amerigroup contained the following certification that the facility must: "comply with state and federal laws and regulations applicable to nursing facilities" and timely comply with the PAE and PASSR requirements.

40.     Boulevard's, Glen Oaks', Manchester's, and Poplar Point's provider agreements with TennCare MCC United Healthcare Plan of the River Valley, Inc. contained the following certification that the facility "shall comply with state and federal laws and regulations applicable to nursing facilities," "shall comply with federal [PASSR] requirements," and "must" meet the PAE requirements prior to payment.

41.     Glen Oaks' and Poplar Point's provider agreements with TennCare MCC United further stated that the "referring physician must certify that the Tennessee Program Member's medical needs require the level of care being requested.  This will be required at the time of pre[-]authorization for the admission as well as ongoing concurrent review."

42.     Boulevard's, Glen Oaks', and Poplar Point's provider agreements with TennCare MCC BlueCare Tennessee contained the following certification:  the facility "shall comply with state and federal laws and regulations applicable to nursing facilities" and "shall comply" with the PASSR requirements.

43.     Upon information and belief, Imperial's provider agreements with TennCare MCCs contained some or all of the same certifications referenced above.

44.     In addition to the Provider Agreements, upon information and belief, the Grossly Substandard Defendant Facilities also executed an Electronic Data Interchange ("EDI") Enrollment Form in order to bill Medicare electronically.

45.     By executing the EDI Enrollment Form, the Grossly Substandard Defendant Facilities agreed to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete, and truthful."

46.     By executing the EDI Enrollment Form, the Grossly Substandard Defendant Facilities also acknowledged "that all claims will be paid from Federal funds, that the submission

of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

47.    The Grossly Substandard Defendant Facilities submitted claims for payment to Medicare and TennCare MCCs electronically, upon information and belief, on forms known as a UB-92, HCFA-1450 or UB-04, CMS-1450, which contain the following certification: "This claim, to the best of my knowledge, is correct and complete . . . ."

48.    The Grossly Substandard Defendant Facilities were required to submit an annual cost report to CMS, in which a responsible official certified: "I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."  The certification also required acknowledgement that "misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law."

49.    In order to participate in and receive payments under the TennCare and Medicare programs, a nursing home must execute a Health Insurance Benefit Agreement, Form CMS-1561 (CMS-1561).  *See* 42 U.S.C. § 1395cc.  By doing so, a provider expressly agrees to conform with the applicable Code of Federal Regulations within Title 42, including the standard of care regulations that implement the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396r *et seq*. *See* 42 C.F.R. § 483.

50.    Upon information and belief, agents of the Grossly Substandard Defendant Facilities executed the Health Insurance Benefit Agreement on behalf of the Defendant Facilities.

The Health Insurance Benefit Agreement expressly committed the providers to comply with federal regulations in order to receive payment:

> In order to receive payment under title XVIII of the Social Security Act [42 U.S.C. § 1395cc], [Name of the nursing home inserted here] as the provider of services, agrees to conform to the provisions of section of [sic] 1866 of the Social Security Act and applicable provisions in 42 CFR [which includes the regulations on care provided in nursing homes].

51.     To receive reimbursement from TennCare and Medicare, the Defendant Facilities were required to complete and submit a Minimum Data Set ("MDS") form to CMS for all residents.  42 C.F.R. §483.315.  CMS relies on the MDS data to determine the *per diem* reimbursement rate for each Medicare Part A beneficiary in a nursing facility.  In the MDS form, the Defendant Facilities had to provide the government with an accurate and comprehensive assessment of each resident's functional capabilities, identify health problems, and formulate a resident's individual plan of care.  Based on the medical condition, nursing care needs, and other information provided in the MDS form, each resident is assigned to a specific Resource Utilization Group, which, in turn, determines the Medicare Part A reimbursement rate for that resident. Hence, CMS relies on the accuracy of the information the nursing facility provides on the MDS form.

52.     The Defendant Facilities were required to complete MDS assessments for all residents upon admission and then quarterly thereafter.

53.     Individuals at the Defendant Facilities who completed the MDS assessments were required to sign the forms, which contained the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for

14

payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility or on its behalf.

54. As a result, *inter alia*, of the foregoing representations and certifications of present and future compliance made or caused to be made by Defendants, the Defendant Facilities were permitted to participate in the Medicare and TennCare programs and receive payments from both programs from January 1, 2010[1] through December 31, 2015.[2]

55. For the periods listed in the paragraph above, the Defendant Facilities received aggregate payments from the TennCare program of approximately $97 million, and aggregate payments from the Medicare program of more than $46 million, for claims for nursing home services provided, or allegedly provided, to TennCare and Medicare beneficiaries at the Defendant Facilities.

<u>NURSING HOME SERVICES UNDER MEDICARE AND TENNCARE</u>

56. The Medicare and TennCare programs pay for a bundle of nursing home services, as described further below, provided to eligible residents on a *per diem* basis under the prospective payment system (PPS). Based upon the MDS assessments that a nursing home submits to the government for each eligible resident, nursing homes are paid a *per diem* reimbursement for each day they provided the required nursing home care to such residents.

57. Statutes and regulations governing the Medicare and Medicaid programs require nursing homes to maintain substantial compliance with the pertinent rules and regulations governing those programs.

---

[1] In the case of Boulevard from January 1, 2011.
[2] In the case of Imperial through April 30, 2013.

58.     Among other things, nursing homes must assure that all services for which they submit claims are "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(A)(2).

59.     As part of the Omnibus Reconciliation Act of 1987, Congress enacted the Nursing Home Reform Act, 42 U.S.C. §§ 1395i-3, 1396r *et seq*. ("the Act"), which took effect on October 1, 1990.  The Act defines a nursing facility as an institution that:

(1)     is primarily engaged in providing to residents –

    (A)     skilled nursing care and related services to residents who require medical or nursing care;

    (B)     rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

    (C)     on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases . . . .

42 U.S.C. § 1396r(a).  During the relevant period in this action, each of the Defendant Facilities was a nursing facility as defined by the Act.

60.     The Act mandates that nursing facilities comply with federal and state requirements relating to the provision of services, and with professional standards and principles applicable to nursing facilities.  42 U.S.C. § 1396r(b); 42 U.S.C. § 1396r(d)(4)(A) ("A nursing facility must operate and provide services in compliance with all applicable federal, state and local laws and regulations . . . and with accepted professional standards and principles which apply to professionals providing services in such a facility").

61.     Specifically, with respect to quality of life for residents of nursing facilities, the Act provides: "A nursing facility must care for its residents in such a manner and in such an

environment as will promote maintenance or enhancement of the quality of life of each resident."
42 U.S.C. § 1396r(b)(1)(A).

62.     Additionally, nursing facilities "must provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which . . . describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met."  42 U.S.C. § 1396r(b)(2)(A).

63.     Under the Act, the manager of a nursing facility must fulfill the residents' plans of care by providing, or arranging for the provision of, nursing and related services and medically-related services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, pharmaceutical services, and dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident. 42 U.S.C. § 1396r(b)(4)(A)(i)-(iv).

64.     The specific regulations with which a nursing facility must comply to qualify for participation in and thereby receive payment from the Medicaid and Medicare programs are set forth at 42 C.F.R. § 483 *et seq.*  These requirements "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid."  42 C.F.R. § 483.1(b).

65.     Federal regulations mandate that "[e]ach resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment [of the resident] and plan of care."  42 C.F.R. § 483.25.

66.     Specifically, the regulations provide (bold in original), *inter alia*:

      a.  **Pressure sores**.  Based on the comprehensive assessment of a resident, the facility must ensure that –

(1) A resident who enters a facility without pressure sores does not develop pressure sores unless the individual's clinical condition demonstrates that they were unavoidable; and

(2) A resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.

42 C.F.R. § 483.25(c).

b. **Nutrition**. Based on a resident's comprehensive assessment, the facility must ensure that a resident –

(1)     Maintains acceptable parameters of nutritional status, such as body weight and protein levels, unless the resident's clinical condition demonstrates that this is not possible; and

(2)     Receives a therapeutic diet when there is a nutritional problem.

42 C.F.R. § 483.25(i).

c. **Hydration**. The facility must provide each resident with sufficient fluid intake to maintain proper hydration and health.

42 C.F.R. § 483.25(j).

d. **Activities of Daily Life**. Based on the comprehensive assessment of the resident, the facility must ensure that – A resident's abilities in activities of daily life do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable. This includes the resident's ability to -

(1)     Bathe, dress, and groom;
(2)     Transfer and ambulate;
(3)     Toilet;
(4)     Eat; and
(5)     Use speech, language or other functional communication systems.

42 C.F.R. § 483.25(a).

e. **Medication Errors**. The facility must ensure that –

(1)     It is free of medication error rates of five percent or greater; and
(2)     Residents are free of any significant medication errors.

42 C.F.R. § 483.25(m).

f.  **Unnecessary Drugs**.

(1)    General. Each resident's drug regimen must be free from unnecessary drugs.  An unnecessary drug is any drug when used:

(i)    In excessive dose (including duplicate therapy); or
(ii)   For excessive duration; or
(iii)  Without adequate monitoring; or
(iv)   Without adequate indications for its use; or
(v)    In the presence of adverse consequences which indicate the dose should be reduced or discontinued; or
(vi)   Any combinations of the reasons above.

(2)    **Antipsychotic Drugs**.  Based on a comprehensive assessment of a resident, the facility must ensure that –

(i)    Residents who have not used antipsychotic drugs are not given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical records; and
(ii)   Residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs.

42 C.F.R. § 483.25(l).

g.  **Accidents**.  The facility must ensure that –

(1)    * * *
(2)    Each resident receives adequate supervision and assistance devices to prevent accidents.

42 C.F.R. § 483.25(h).

h.  **Urinary Incontinence**.  Based on the resident's comprehensive assessment, the facility must ensure that –

(1)    A resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary; and

(2)    A resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible.

42  C.F.R. § 483.25(d).

67.     The regulations implementing the Act also require that nursing facilities maintain sufficient nursing staff "to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care."  42 C.F.R. § 483.30.

68.     Compliance with comply with federal and state requirements relating to the provision of services, and with professional standards and principles applicable to nursing facilities, was material to Medicare's and TennCare's decision to pay the Defendant Vanguard Facilities' claims.  Compliance with these requirements is central to the skilled nursing facility benefit.

69.     The government routinely denies payment for skilled nursing facility services, or seeks to recoup payments already made, when grossly substandard care was provided.  For example:

(a)     The United States Department of Justice (DOJ) has litigated or settled numerous actions where it was alleged that a skilled nursing facility submitted claims for grossly substandard care.  *See, e.g*., Daybreak Partners, LLC Settlement Press Release (Oct. 24, 2016), *available at* www.justice.gov/usao-ndtx/pr/nursing-home-chain-pay-53-million-resolve-false-claims-allegations; Watsonville Nursing Home Settlement Press Release, *available at* www.justice.gov/usao-ndca/pr/watsonville-nursing-home-owners-operators-agree-pay-38-million-settle (May 21, 2015); Extendicare Settlement Press Release (Oct. 10, 2014), *available at* www.justice.gov/opa/pr/extendicare-health-services-inc-agrees-pay-38-million-settle-false-claims-act-allegations (Oct. 10, 2014); Erlanger Nursing Home Settlement Press Release (Feb. 25, 2013), *available at* www.justice.gov/usao-edky/pr/erlanger-nursing-home-and-united-states-government-settle-civil-allegations (Feb. 25, 2013).

(b)     States have also sued to enforce these requirements in so far as they harm their Medicaid programs.  *See, e.g*., Pennsylvania Sues Nursing Home Chain in Pittsburgh (Nov. 7, 2016), *available at* wpxi.com/news/ag-files-lawsuit-against-pittsburgh-based nursing-home-chain/ 463974657 (Nov. 5, 2016); A.G. Schneiderman Announces Landmark Civil Settlement (June 22, 2016), *available at* ag.ny.gov/press-release/ag-schneiderman-announces-landmark-civil-settlement-long-island-nursing-home-and-its.

(c)     The United States and Tennessee also terminated Imperial after they learned about the scope of the grossly substandard services there from the 2013 state survey, and CMS and Tennessee referred the Imperial matter to law enforcement for investigation.

(d)     Moreover, DOJ has also filed the present action in which the United States and Tennessee allege that they were damaged and are entitled to recoup the monies that were improperly paid to the Defendant Facilities for grossly substandard care.

70.     Accordingly, a reasonable person would know that Medicare or TennCare would not pay skilled nursing claims submitted to Medicare or TennCare if these programs knew that the beneficiaries for whom the claims were paid received grossly substandard care. Alternatively, these Defendants knew or had reason to know that Medicare or TennCare would not pay claims submitted to Medicare or TennCare if these programs knew that the beneficiaries for whom the claims were submitted received grossly substandard care.

## PRE-ADMISSION EVALUATIONS (PAEs) FOR TENNCARE LONG-TERM CARE SERVICES

71.     TennCare offers Long-Term Services and Supports (LTSS) to its qualifying beneficiaries. These services may be provided through the TennCare CHOICES Program, which includes nursing facility services. Tenn. Comp. R. Reg. § 1200-13-01.

72.     Tennessee requires nursing facilities to submit a Pre-Admission Evaluation (PAE) in many circumstances, including when a TennCare-eligible individual is admitted to a nursing facility to receive nursing facility services. *Id*. § 1200-13-01-.10(2). TennCare uses PAEs to determine an individual's medical eligibility for TennCare-reimbursed nursing facility care. *Id*. §§ 1200-13-01-.02(113); 1200-13-01-.10.

73.     An individual, including a licensed nurse, must certify that the level of care information for the individual in the PAE is accurate in the upper portion of the PAE form called "Certification of Assessment."

21

74.     A physician must separately sign and date the PAE to signify that the individual requires the level of care or reimbursement in the assessment and that the services are medically necessary in the lower portion of the PAE form called "Physician Certification of Level of Care." *Id*. §§ 1200-13-01-.02(17), (113) & (118).

75.     By executing the above certifications on the PAE, each such certifier acknowledges that:  "any intentional act on my part to provide false information that would potentially result in a person obtaining benefits or coverage to which s/he is not entitled is considered an act of fraud under the State's TennCare program" and that under the TMFCA a person who presents or causes to be presented to Tennessee a false TennCare claim for payment knowing such claim to be false "is subject to federal and state civil and criminal penalties."

76.     The signatures on the upper and lower certifications on the PAEs are a significant mechanism to ensure that these level of care determinations are made by a medical professional of the type specified for each certification.

77.     TennCare relies upon the certified PAE information as part of its determination of a patient's eligibility for long-term care services.

78.     No TennCare payments may be made for nursing facility services rendered before the date when there is an approved PAE for an individual, except to the extent that claims fall within a 10-day window.  Tenn. Comp. R. Reg. § 1200-13-01-.10(2)(g) & (j) & (3)-(4).

79.     The presence of certifications by qualified individuals on PAEs is so central to the long-term care, skilled nursing TennCare benefit that it is expressly designated as a condition of payment for this care.  Tenn. Comp. R. & Reg. §§ 1200-13-01-.10(2)(g) & -.10(3)(f).

80.     Imperial and the Physician Forgery Defendant Facilities engaged in systemic and pervasive violations of the PAE certification requirements.  These violations occurred with respect

to multiple patients at multiple facilities over a period of years. These violations were not *de minimis* violations of technical requirements tangential to TennCare's long-term care benefit, but, rather, were violations that relate to the very foundation of the TennCare LTSS program.

81.     The government routinely denies payment for forged pre-certification documents. For example:

    (a)    The government has filed and litigated many False Claims Act cases predicated on forged signatures on health care forms. *See*, *e.g.*, *United States v. Dynamic Visions, Inc.*, No. 11-695 (CKK) (D.D.C.); *United States v. Speqtrum, Inc*. No. 10-2111 (JEB) (D.D.C.).

    (b)    The United States and Tennessee terminated Imperial from the Medicare and TennCare programs after they learned about the forged PAEs there from the 2013 state survey.

    (c)    Moreover, DOJ has also filed the present action in which the United States and Tennessee allege that Imperial and the Physician Forgery Defendant Facilities submitted forged PAEs to TennCare.

82.     When a PAE is not actually signed by the qualified certifier because it is forged and/or photocopied, TennCare will deny the PAE.

PREADMISSION SCREENING/RESIDENT REVIEWS
(PASRRs) FOR TENNCARE LONG-TERM CARE SERVICES

83.     Tennessee also requires nursing facilities to submit a PreAdmission Screening/ Resident Review (PASRR) to determine whether an individual who seeks admission to a TennCare-certified nursing facility has or may have mental illness or intellectual disability and, if so, whether they need specialized services and are appropriate for nursing facility placement. *See* 42 C.F.R. § 483.100 *et seq*.; Tenn. Comp. R. Reg. §§ 1200-13-01-.02(114), 1200-13-01-.10(2)(i).

84.     An individual, including a licensed nurse, must certify in the portion of the PASRR called "Level I" that the information on the PASRR about whether the individual in the PASRR has a mental illness or intellectual disability is accurate.

85.     If the PASRR Level I screen indicates a PASRR condition, and if an exemption or categorical determination does not apply, then the applicant must also complete a Level II evaluation of the individual's condition.  If the individual is exempt from the Level II PASRR evaluation of need for specialized services, a physician must so certify with a signature and date of that signature.

86.     By executing either of these certifications on the PASRR, the certifier acknowledges that "any intentional act on my part to provide false information that would potentially result in a person obtaining benefits or coverage to which s/he is not entitled is considered an act of fraud under the State's TennCare program" and that under the Tennessee Medicaid False Claims Act a person who presents or causes to be presented, to the State, a claim for payment under the TennCare program knowing such claim to be false "is subject to federal and State civil and criminal penalties."

87.     No TennCare payments may be made for nursing facility services rendered before the date when there is a completed and certified PASRR for an individual.  *Id*. § 1200-13-01-.10(2)(j) & (3) -(4).

88.     The presence of certifications by qualified individuals on PASRRs is so central to the long-term care, skilled nursing TennCare benefit that it is expressly designated as a condition of payment for this care.  Tenn. Comp. R. & Reg. §§ 1200-13-01-.10(3)(c) & .10(3)(f).

89.     The Physician Forgery Defendant Facilities engaged in systemic and pervasive violations of the PASRR certification requirements.  These violations occurred with respect to multiple patients at multiple facilities over a period of years.  These violations were not *de minimis* violations of technical requirements tangential to TennCare's long-term care benefit, but, rather, were violations that relate to the very foundation of the TennCare LTSS program.

24

90.     The government routinely denies payment for forged pre-certification documents. For example:

(a)     The United States has filed and litigated many False Claims Act cases predicated on forged signatures on health care forms. *See*, *e.g.*, *United States v. Dynamic Visions, Inc*., No. 11-695 (CKK) (D.D.C.); *United States v. Speqtrum, Inc*. No. 10-2111 (JEB) (D.D.C.).

(b)     Moreover, DOJ has also filed the present action in which the United States and Tennessee allege that the Physician Forgery Defendant Facilities submitted forged PASRRs to TennCare.

91.     When a PASRR is not actually signed by the qualified certifier because it is forged and/or photocopied, TennCare will deny the PASRR.  Accordingly, a reasonable person would know that Medicare or TennCare would not pay skilled nursing claims submitted to TennCare if TennCare knew that the submitted PAE or PASRR for that resident had a forged certification. Alternatively, these Defendants knew or had reason to know that TennCare would not pay claims submitted to TennCare if these programs knew that the PAE or PASRR for that resident during the applicable payment period had a forged certification signature.

DEFENDANTS' NON-EXISTENT, GROSSLY
SUBSTANDARD, AND/OR WORTHLESS SERVICES TO RESIDENTS AT
IMPERIAL, CRESTVIEW, BOULEVARD, GLEN OAKS, AND POPLAR POINT

92.     Vanguard Parent and Vanguard Corporate were responsible for ensuring that the Defendant Facilities provided their residents with a bundle of nursing home services that met the regulatory requirements and that, overall, would ensure "the highest practicable level of physical, mental, and psychosocial well-being [of] every resident."  42 U.S.C. § 1396r(b)(2)(A).

93.     Instead, from on or about January 1, 2010[3] through December 31, 2015,[4] the Grossly Substandard Defendant Facilities provided and billed the government for non-existent, grossly substandard, and/or worthless care to their residents.

94.     For example, and as described further below, the Grossly Substandard Defendant Facilities systemically:

a. Failed to provide skilled nursing services in accordance with physicians' orders;
b. Failed to provide standard infection control, resulting in urinary tract infections (UTIs) and wound infections;
c. Failed to administer medications to residents as prescribed by their physicians and instead gave residents either too much medication, too little medication, late medications, and/or the wrong medications, resulting in serious adverse health consequences;
d. Failed to provide wound care as ordered by physicians, or take necessary prophylactic measures to prevent pressure ulcers, such as turning and repositioning;
e. Failed to adequately manage residents' pain;
f. Did not revise or update residents' plans of care to account for pressure ulcers, increased pain, or other deterioration in residents' conditions;
g. Provided unnecessary and excessive psychotropic medications to residents;
h. Used unnecessary physical restraints on residents;
i. Failed to prevent excessive resident falls;
j. Failed to meet the basic nutrition and hygiene requirements of residents in accordance with their plans of care; and
k. Failed to have basic and adequate equipment and supplies.

95.     Many of these failures of care were related to the Grossly Substandard Defendant Facilities' failure to provide sufficient staffing to meet residents' needs.

96.     The Nursing Home Reform Act and its regulations required Defendants to ensure that the Defendant Facilities had "sufficient nursing staff to provide nursing and related services" to ensure "the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care."    42 C.F.R. § 483.30. However, the Grossly Substandard Defendant Facilities did not maintain nursing staff sufficient

_____

[3] In the case of Boulevard from January 1, 2011.
[4] In the case of Imperial through April 30, 2013.

to provide the level of services necessary for their residents to receive the most basic nursing home goods and services such as food, drink, and assistance with bathing and toileting, among other goods and services needed to attain or maintain their highest practicable physical, mental, and psychosocial well-being.

97. Registered nurses and other employees at the Grossly Substandard Defendant Facilities, as well as family members of residents, observed inadequate staffing levels and made it known to the Defendants. But, Defendants failed to increase staffing to a level sufficient to provide the requisite care to the Grossly Substandard Defendant Facilities' residents.

98. Vanguard Parent, Vanguard Corporate, and the other Vanguard subsidiaries working out of Vanguard Brentwood Headquarters took various actions that contributed to the staffing shortages. Among other things, they failed to provide adequate resources to attract and retain qualified staff; cut labor costs, resulting in a poor work environment and very high turnover among both managerial medical staff and other staff; maintained an environment in which the nurses and managerial nurses felt disrespected; and finally, where the staff lacked clinical and clerical supplies.

99. When problems arose at the Grossly Substandard Defendant Facilities either as reflected in state surveys or otherwise, Vanguard Parent, Vanguard Corporate, and the other Vanguard subsidiaries working out of Vanguard Brentwood Headquarters often reacted by terminating the facility's Administrator and/or Director of Nursing.

100. Defendants' failure to provide qualified and adequate staffing at the Grossly Substandard Defendant Facilities contributed greatly to the facilities' provision of non-existent, grossly substandard, worthless care.

101.     Defendants were responsible for providing their nursing facility residents with a clean, safe and sanitary living environment.  Defendants failed to do so at the Grossly Substandard Defendant Facilities.  As a result, residents remained in soiled beds, and without bathing for long periods of time, among other problems.  These facilities were also in frequent need of essential repairs, including to their call systems and exit doors.

102.     Defendants were responsible for providing pharmaceutical services to meet the needs of each resident.  But Vanguard Parent, Vanguard Corporate, and the other Vanguard subsidiaries working out of Vanguard Brentwood Headquarters arranged for the primary pharmacy for the Defendant Facilities to be the Vanguard subsidiary, Elderscript, which is physically located in Tupelo, Mississippi, which is approximately 100 miles away from Poplar Place, the closest Defendant Facility, and approximately 200 miles away from the other Defendant Facilities in Middle Tennessee.  The far-away location of Elderscript made it difficult for the Grossly Substandard Defendant Facilities to obtain medications in a timely manner.

103.     The Grossly Substandard Defendant Facilities' use of Elderscript as their pharmacy resulted in the delivery of untimely medications to residents who at times had to go without their medications until the next shipment of medicine arrived from Tupelo.  Managerial employees at the Grossly Substandard Defendant Facilities observed these problems due to the use of Elderscript and alerted Defendants, including Defendant Miller.  But Defendants – including Vanguard Parent, which directly owned Elderscript, and Orand, who indirectly had the majority ownership stake in Elderscript through Vanguard Parent – failed to switch to a closer pharmacy or otherwise resolve these problems and instead kept Elderscript as the Defendant Facilities' pharmacy.

104.    Defendants also failed to prevent drug diversion, including theft of medications by staff, at two or more of the Grossly Substandard Defendant Facilities, which worsened the situation involving lack of needed medications at the facilities.

105.    Defendants were aware of the problems with insufficient resources at the Grossly Substandard Defendant Facilities and the resulting adverse health effects on their residents, but recklessly disregarded them, were deliberately ignorant of them, and ultimately, failed to resolve these problems, or to do so in a timely fashion.

106.    Defendants focused on achieving a high patient census at all of the Grossly Substandard Defendant Facilities, rather than on delivering quality resident care required by the relevant regulations.  Had CMS and TennCare known that these grossly substandard services were being provided at the Grossly Substandard Defendant Facilities, CMS and TennCare would not have paid the claims.

EXAMPLES OF REPORTS AFFIRMING DEFENDANTS'
KNOWLEDGE OF GROSSLY SUBSTANDARD CONDITIONS

107.    Defendants possessed knowledge concerning the non-existent, grossly substandard, worthless resident care at the Grossly Substandard Defendant Facilities, not only by means of their direct operation and management of the facility, but also from various contacts, reports and events that affirmed such knowledge.

108.    **Imperial Gardens**.  On November 6, 2009 and again on January 6, 2011, the Tennessee Department of Health cited Imperial Gardens for both a severe deficiency and a substandard care deficiency.

109.    On May 23, 2011, CMS designated Imperial as a Special Focus Facility (SFF) due to its noncompliance with quality of care and safety requirements under Medicare.  The SFF designation results when a facility is a chronically underperforming nursing home with a pattern

of having more problems, and more serious problems, than other nursing homes for a three-year period before the designation. CMS requires that SFFs will be visited by CMS or the State in person twice as often as other facilities.

110. In January 2012, while Imperial remained an SFF, Vanguard Corporate's President Scott Burleyson complained about Imperial's ratio of nursing hours per resident day not helping the corporate profitability plan, and he recommended that Imperial decrease this hourly ratio within the next six months.

111. In March 2012, Vanguard Corporate terminated Imperial's Administrator and replaced her with Gary Van Nostrand (Van Nostrand) as the new Administrator. When he started work at Imperial, there were approximately 35 open nursing positions, no nurse leadership in place, and no unit managers.

112. In June 2012, Defendant Miller instructed Van Nostrand to remove all contract staff from medical staffing agencies (as distinct from regular employees) from Imperial by July 16, 2012. When this occurred, the agency staff were not replaced with new, regular staff at Imperial.

113. Imperial held morning meetings during this period at which staff frequently raised staffing problems and medication errors at the facility. However, remedies to fix these problems were not brought up at these meetings, and these problems continued uncorrected.

114. In approximately the Summer of 2012, staff from another Vanguard facility performed an audit of Imperial. The audit showed that wound care was a serious problem and that there were incomplete patient care plans, problems with infection control and charting, and stacks of unaddressed test results showing that certain residents should be on blood thinners. A copy of this audit was sent to Defendant Miller at Vanguard Corporate.

30

115.    On October 29, 2012, Imperial graduated from its Special Focus Facility designation, meaning that it was no longer designated as such a nursing home.

116.    In November 2012, Vanguard sent one of its nurses from another facility to work at Imperial for two days on the 7 a.m. until 7 p.m. shift.  That nurse found that there was one nurse assigned to 80 patients.  When this nurse inquired about the staff shortages, he was told that management was aware of them.  This nurse also observed:

- out of date medications on the medication care, including insulin that was 45 days out of date;
- residents who were short on pills, such that another nurse borrowed pills from another resident because ordering medications was difficult;
- the Activities Director – who was not a nurse – supervising nurses one day;
- failure to follow bowel protocols
- an ulcer on a female patient who had not had a bowel movement in 10 days and was complaining of pain;
- a resident whose PEG tube for delivering enteral nutrition was dirty and so coagulated that the patient was not receiving any nutrition;
- lack of snacks, because all of the snacks were expired;
- residents reporting that they had not received a shower or had their diapers changed;
- one resident say that Imperial staff treated her like a "disease;" and
- a deceased resident whom no Imperial staff had yet noticed.

117.    In or about 2012 and 2013, there were many complaints about service issues with the pharmacy, ElderScript.  In and around that period, Van Nostrand and another Imperial Administrator separately informed Defendant Miller about these problems, but Miller did not resolve them.

118.    During the 2010 to April 2013 period, Imperial's medical director received complaints about call lights not being answered, patients not receiving medications on time, labs not being done, and the wrong medications being given out.  The medical director informed Vanguard Corporate, including Defendant Miller and a Vanguard Corporate nurse, about Imperial's problems, including its need for more staff, but Vanguard Corporate ignored these issues and did not remedy the problems.

119.     On February 15, 2013, the Tennessee Department of Health, Health Care Facilities (HCF), East Tennessee Regional Office, surveyed Imperial Gardens.  The survey found that Imperial Gardens was not in substantial compliance with Medicare requirements and that conditions in the facility constituted immediate jeopardy to residents and substandard quality of care existed as to federal requirements involving resident rights, quality of care, nursing services, physician services, pharmacy services, and administration.  The specific findings included significant medication errors with multiple residents not receiving medications due to unavailability or failure to administer the appropriate medicines; changes in condition for 13 residents resulting in delayed administration of pain medications; delayed treatment of pressure sores, and infections; failure to ensure that at least 21 residents were free from significant medication errors with insulin, anticoagulants, and other medications; and failure to ensure a system of correct medication transcription and administration of medications as ordered.

120.     While the survey was in progress, Defendant Miller acknowledged that he had been on site at Imperial weekly in recent months and that Vanguard Corporate had clinical communications daily with the facility.  Miller knew about Imperial Garden's struggles with staffing and retention and problems with failure to obtain medications.

121.     On February 22, 2013, CMS terminated Imperial Gardens' Medicare provider agreement and gave the facility a 30-day period to facilitate the orderly transfer/relocation of patients who were TennCare and Medicare beneficiaries.

122.     On February 25, 2013, the Tennessee Department of Health suspended Imperial Gardens from admitting new residents to the facility.  By late April 2013, Imperial Gardens closed and ceased operating.

123.    Defendants also had knowledge of the non-existent, grossly substandard and/or worthless services at Imperial as a result of personal injury claims brought by former residents and their family members, including approximately 11 claims resulting in litigation during the 2010 through 2015 period.

124.    Had CMS and TennCare known that these grossly substandard services were being provided at Imperial, CMS and TennCare would not have paid the claims.

125.    Despite Imperial's closure, Vanguard Parent and Vanguard Corporate continued to focus on growing patient census above delivering quality resident care at the other Grossly Substandard Defendant Facilities that were still operating: Crestview, Boulevard, Glen Oaks, and Poplar Point.

126.    **Crestview**.  On February 24, 2011, HCF, West Regional Office, cited Crestview for a severe deficiency related to infection control.

127.    In May and June 2012, HCF cited Crestview for a severe deficiency and a substandard care deficiency and found that conditions there constituted immediate jeopardy to the residents' health and safety.  "Immediate jeopardy" means a situation in which a Facilities' noncompliance with one or more requirements has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident.

128.    In June 2012, CMS imposed a Civil Monetary Penalty against Crestview based on its failure to comply with the nursing home participation requirements and its quality of care deficiencies.

129.    Following the immediate jeopardy citations above, Defendant Miller asked Imperial to send its Dietary Manager who was slated for termination to fill that position at

Crestview, because Miller believed that having a substandard employee in the Dietary Manager position was preferable to leaving that position open.

130.    On October 29, 2012, CMS designated Crestview as an SFF due to its non-compliance with Medicare quality of care and safety requirements.

131.    On December 3, 2012, the government completed a Special Focus Facility Life Safety Survey that cited Crestview as having conditions that constituted immediate jeopardy to residents.

132.    On March 6, 2015, during the annual licensure survey, HCF, West Tennessee Regional Office, cited Crestview for failure to ensure practices were maintained to prevent the potential spread of infection and cross contamination when one of five nurses failed to sanitize a stethoscope prior to resident contact. Tennessee also found that weight loss, the presence of stage III or IV pressure ulcers, and the unnecessary use of medication exceeded the Quality of Care and Quality of Life Indicator (QCLI) threshold.

133.    On October 20, 2015, the Tennessee Department of Health, West Tennessee Regional Office, found Crestview was not in substantial compliance with requirements.

134.    Defendants also had knowledge of the non-existent, grossly substandard and/or worthless services at Crestview as a result of personal injury claims brought by former residents and their family members, including approximately four claims resulting in litigation during the 2010 through 2015 period.

135.    Had CMS and TennCare known that these grossly substandard services were being provided at Crestview, CMS and TennCare would not have paid the claims.

136.    **Boulevard**.  On November 10, 2010, September 11, 2013, and October 16, 2014, HCF cited Boulevard for a severe deficiency.   In the 2013 survey, HCF found that Boulevard

34

failed to complete quarterly MDS information for its residents and in so doing failed to accurately assess areas such as falls, weight loss, urinary incontinence, pressure ulcers, respiratory needs, and mental stability of residents. That survey further found that Boulevard failed to develop care plans needed to ensure necessary care and services for residents and that Boulevard was failing to secure infection prevention.

137.    When a Director of Nursing at Boulevard started her employment in 2011, she found a thick stack of complaints that had not been addressed and that over half of the residents had wound issues. Many residents told the Director of Nursing that they were afraid to live there.

138.    In 2012 or 2013, staff began referring to Boulevard as "Little Imperial."

139.    In its September 11, 2013 survey, HCF further found that Boulevard was not in substantial compliance with nursing home patient care requirements, pursuant to 42 U.S.C. §§ 1395i-3(h), 1396r(h) and 42 C.F.R. Part 488. Specifically, Boulevard failed to complete quarterly MDS forms for its residents and, in doing so, failed to accurately assess areas such as falls, weight loss and gains, urinary incontinence, pressure ulcers, respiratory needs and mental stability of residents. Boulevard failed to develop care plans to ensure the necessary care and services for its residents to include updating the care plan to address resident's medical, nursing, and mental and psychosocial needs. Moreover, residents' dental concerns were not being met, food was not being prepared properly, access to dangerous areas was not being secured, and infection prevention and control were not being done to standards.

140.    In the period from 2013 through 2015, Boulevard had approximately six different Administrators and six different Directors of Nursing.

141.    Defendants also had knowledge of the non-existent, grossly substandard and/or worthless services at Boulevard as a result of personal injury claims brought by family members

of former residents, including approximately two claims resulting in litigation during the 2010 through 2015 period.

142.     Had CMS and TennCare known that these grossly substandard services were being provided at Boulevard, CMS and TennCare would not have paid the claims.

143.     **Glen Oaks**.  On July 9, 2013, HCF cited Glen Oaks for not being in substantial compliance with the participation requirements for nursing homes participating in the Medicare and/or Medicaid programs.

144.     On February 13, 2014, the Tennessee Department of Health, Health Licensure and Regulation, found Glen Oaks to be deficient in pharmacy services/medication administration and dietary services/nutrition and infection control.  On February 21, 2014, HCF cited Glen Oaks for failing to ensure all internal and external medications and chemicals were stored separately, that food was served under sanitary conditions, and that contaminated stethoscopes were disinfected.

145.     Defendants also had knowledge of the non-existent, grossly substandard and/or worthless services at Glen Oaks as a result of personal injury claims brought by former residents and their family members, including approximately eight claims resulting in litigation during the 2010 through 2015 period.

146.     Had CMS and TennCare known that these grossly substandard services were being provided at Glen Oaks, CMS and TennCare would not have paid the claims.

147.     **Poplar Point**.  In 2010, Vanguard Corporate conducted an investigation of Poplar Point and determined that it had significant nurse staffing deficits and high staff turnover and that medications were not being administered as ordered.

148.     On December 16, 2011, HCF found in its annual survey that Poplar Point was not clean, sanitary or in good repair, that food was not being protected from dust, flies, rodents,

unnecessary handling, droplet infection, overhead leakage, and other sources of contamination, and that perishable food was allowed to stand at room temperature and prepared food was not being kept hot or cold as appropriate. During that same survey, the State of Tennessee Bureau of Licensure and Regulation found deficiencies in physical sanitation, nursing services, staffing and education, quality of care, dietary services/nutrition, resident assessment, and quality of life.

149. On January 6, 2014, HCF concluded that Poplar Point exceeded the threshold in accidents, death, tube feeding, unnecessary medications, rehabilitation, and environmental observations.

150. On May 8, 2015, HCF cited Poplar Point for deficiencies involving pharmacy services/medication administration, physical environment/sanitation, dietary services/nutrition, and infection control. The QCLI results showed that Poplar Point also exceeded the threshold in nutrition and caused significant weight loss in five residents.

151. Defendants also had knowledge of the non-existent, grossly substandard and/or worthless services at Poplar Point as the result of personal injury claims brought by former residents and their family members, including approximately eleven personal injury claims brought by former residents and their family members resulting in litigation during the 2010 through 2015 period. Vanguard settled at least four of those lawsuits during the 2010 through 2013 period for approximately $800,000 in total.

152. Had CMS and TennCare known that these grossly substandard services were being provided at Poplar Point, CMS and TennCare would not have paid the claims.

153. Defendants not only had direct knowledge of the non-existent, grossly substandard and/or worthless services provided at all five of the Grossly Substandard Defendant Facilities through their exercise of control over the budget, billing, and all other aspects of the Grossly

37

Substandard Defendant Facilities' operations, but they also they took affirmative actions that caused and contributed to the making of false or fraudulent claims, representations and certifications.

154.    Nursing homes such as the Grossly Substandard Defendant Facilities use medication administration records (MARs), treatment administration records (TARs), and activity of daily living (ADL) sheets to document resident care.  The MARs, TARs and ADL sheets created and maintained at the Grossly Deficient Defendant Facilities contained numerous blanks for extended periods of time, and at other times contained demonstrably false entries, for example, purportedly documenting care provided to residents who were not even present in the facility on the dates of the purported care.

155.    Defendants had actual knowledge, recklessly disregarded and/or remained in deliberate ignorance, of the truth or falsity or their claims, representations and certifications made to TennCare and Medicare.  Defendants knowingly made or cause to be made to TennCare and Medicare false or fraudulent claims, representations and certifications, within the meaning of the FCA, 31 U.S.C. § 3729(b), and the TMFCA, Tenn. Code Ann. § 71-5-182.

156.    Reasonable persons would not have paid the affected claims for grossly substandard care, since those claims violated program requirements that were material to the United States' and Tennessee's payment decisions, and the United States and Tennessee did not get what they bargained for in paying for the services that were non-existent, grossly substandard and/or worthless.

157.    Alternatively, Defendants knew or had reason to know that if Medicare or TennCare had known about the grossly substandard services at the Grossly Substandard Defendant Facilities, they would not have paid the claims.

## DEFENDANTS' SUBMISSION OF FORGED PAES AND/OR PASRRS

158.    During the period from at least September 20, 2012 through April 30, 2014, five Vanguard Defendant Facilities submitted PAEs and/or PASRRs with forged certification signatures to TennCare to obtain reimbursements.  There were two separate sets of these forged certifications at different Vanguard Tennessee facilities – first at Imperial Gardens from at least September 20, 2012 through February 13, 2013, and second at the Physician Forgery Defendant Facilities (Boulevard, Glen Oaks, Manchester, and Poplar Point) from December 2012 through April 30, 2014.

159.    In February 2012, Vanguard Corporate's lead Medicaid biller instructed the then-Administrator of Imperial Gardens to ensure that PAEs be submitted quickly so as to prevent Vanguard from having to write-off funds that it sought to receive as TennCare reimbursement for services provided to residents who lacked an approved PAE at the time of service.

160.    From at least April 2012 forward, Vanguard Parent and Vanguard Corporate knew that their Tennessee nursing facilities would not get paid for care provided to patients without an approved PAE and PASRR that included a signature from both a nurse and a physician certifying to the appropriate level of care for the applicant.  In 2012 and 2013, Vanguard Corporate, on behalf of Vanguard Parent, gave guidance to this effect to their Tennessee nursing facilities.

## FIRST VIOLATION WITH FORGED NURSE SIGNATURE ON PAEs AT IMPERIAL

161.    During 2012, Defendants Miller, Vanguard Parent and Vanguard Corporate closely monitored Imperial Gardens and the speed at which PAEs were submitted there for approval by TennCare.

162.    Imperial Gardens' then Administrator, Van Nostrand, knew that PAEs required a signature for the certification of assessment section in the upper half of the PAE and that a licensed

nurse's signature would suffice for that. But Van Nostrand lacked a Tennessee nursing license. Van Nostrand also knew that – without those forms – Imperial Gardens would have to discharge patients.

163.    On October 4, 2012, on behalf of Vanguard Parent and Vanguard Corporate, Defendant Miller met with Van Nostrand and spoke to him about the PAE process.

164.    In or about Summer or early Fall 2012, Van Nostrand instructed Nurse A, who was then completing the nurse certification of assessment for Imperial Gardens' PAEs, to give him the PAEs before submitting them to TennCare. Nurse A believed that Van Nostrand was changing her PAE assessments and she confronted him about this, since her name was on the certifications. In response, Van Nostrand stopped Nurse A from handling future PAEs. Nurse A reported these events to Vanguard Corporate's office.

165.    Afterwards, in or about September 2012, Van Nostrand began filling out the upper portion of the PAEs level of care assessment himself and then giving them to Imperial Gardens' medical records clerk to submit to TennCare.

166.    Around this same time, Van Nostrand instructed this medical records clerk to place the electronic signature of Nurse B on the upper portion of the PAE level of care assessment that requires a certification signature. That upper portion of the PAE certification – which could be signed by a licensed nurse – stated:

> I certify that the level of care information provided in this PAE is accurate. I understand that this information will be used to determine the applicant's eligibility and/or reimbursement for long-term care services. I understand that any intentional act on my part to provide false information that would potentially result in a person obtaining benefits or coverage to which s/he may not be entitled is considered an act of fraud under the Tennessee Medicaid False Claims Act, any person who presents or causes to be presented to the State a claim for payment under the TennCare program knowing such claim is false or fraudulent is subject to federal and state civil and criminal penalties.

167.   Upon information and belief, Van Nostrand did not sign that upper certification himself, because he lacked a Tennessee nursing license.

168.   Although Nurse B had a Tennessee nursing license, she **never** did the PAE assessments that were being certified with her signature, and she **never** gave permission for her name to be used on PAEs.

169.   The medical records clerk informed Nurse A about the use of Nurse B's forged signature on PAEs.  Nurse A informed both Nurse B and a senior management official at Vanguard Corporate about this practice.

170.   The Vanguard Corporate official indicated that they would send someone to Imperial Gardens and do an audit.  But upon information and belief, Vanguard Corporate did neither and allowed the forgery practices at Imperial Gardens to continue.

171.   After she learned about the forgery of her name, Nurse B questioned Van Nostrand about this.  Soon afterwards, Van Nostrand demoted her.

172.   During the February 2013 survey of Imperial Gardens, staff reported the above use of Nurse B's forged nurse signature on PAEs.  HCF cited Imperial Gardens for this violation, which was one of the reasons for the facility's 2013 closure.

173.   If TennCare had known about the forged PAEs at Imperial at the time, they would not have paid the affected TennCare claims.

SECOND VIOLATION WITH FORGED PHYSICIAN SIGNATURES ON PAEs/PASRRs
AT BOULEVARD TERRACE, GLEN OAKS, POPLAR POINT, AND MANCHESTER

174.   From at least December 2012 through April 30, 2014, the Physician Forgery Defendant Facilities used blank PAEs and PASRRs with photocopied physician signatures on them for the lower portion of the forms that required a physician certification.  Staff at these facilities then entered the patient assessment information onto the forms and post-dated the

physician's certification.  The physicians whose forged signature were on the PAEs and PASRRs never certified the accuracy of these forms prior to submission.

175.    On November 19, 2013 – nearly one year into this scheme and six months before it ended – Manchester's Administrator asked Vanguard Corporate for training on PAEs and PASRRs.  If Vanguard Corporate had given the appropriate training at that time, the forgery scheme may have ended then.

176.    Instead, in response to the training request, Vanguard Corporate never gave the Manchester Administrator any guidance of its own and instead merely pointed her to staff at Manchester and Glen Oaks who had done these forms before.  However, staff at both Manchester and Glen Oaks were already using PAEs and PASRRs with photocopied physician signatures at that time and thus submitting forged forms to TennCare.

177.    On April 29, 2014, Tennessee Bureau of Investigation (TBI) agents visited Manchester and met with Defendant Miller, Manchester Administrator Steve Nee, and Vanguard General Counsel Nick Lamkin, presented examples of PAEs and PASRRs from Manchester with photocopied physician signatures, and asked to see where the PAEs and PASRRs were completed and stored.  The Vanguard agents initially denied using PAEs and PASRRs with photocopied signatures on them.

178.    But, during the meeting, Lamkin located and showed the TBI agents a binder from the MDS coordinator's office marked "PAE" that contained 30 pre-printed PAE forms with a physician signature already present.  The TBI agents also found a binder in the same office marked "PASRR" that contained completed PASRRs with signatures that appeared photocopied, but no actual blank PASRR forms without patient information.

179.    That day TBI agents interviewed two nurses at Manchester, who said that they always used PAEs with physician signatures already on the forms before the patient information was added.  One of these nurses said that she had completed two PASRRs that morning using blank PASRR forms with pre-copied physician signatures already on them and that she was trained to do it that way.

180.    That same day, a physician whose forged signature appeared on Manchester forms told TBI agents that day that someone asked him to sign a blank PAE form and that he had done so at the time.

181.    During the relevant period, physicians at the Physician Forgery Defendant Facilities were not truly certifying to accuracy of the PAE's level of care assessments or the mental illness or intellectual disability information on the PASRRs.

182.    During this period, Defendants were knowingly submitting, or causing the Facilities to submit, these false documents to TennCare in order to obtain payment.

183.    Because the affected PAEs and PASRRs during the 2012 through 2014 period had forged nurse or physician signatures, TennCare would have denied these residents' approval for the CHOICES program and thus would not have paid for the TennCare long-term care claims that Imperial, Boulevard, Glen Oaks, Poplar Point, and Manchester submitted for these patients.

184.    Reasonable persons would not have paid for the affected TennCare claims tainted by the forged nurse and physician signatures on PAEs and PASRRs during this period, because the forged signatures were significant violations of TennCare program requirements that were express conditions of payment that go to the heart of the function of the PAE and PASRR precertification/ gatekeeper function and they were material to the United States' and Tennessee's payment decisions.

<u>SPECIFIC EXAMPLES OF FALSE OR FRAUDULENT CLAIMS</u>

185.     The following paragraphs set forth examples of (1) non-existent, grossly substandard, worthless, harmful care provided by Defendants, and (2) PAEs and PASRRs with forged certification signatures, for which Defendants made, or caused to be made, false or fraudulent claims to TennCare and/or Medicare, and for which they wrongfully received and retained payments.

186.     Attached to and made part of this Complaint is Exhibit A, which contains a summary chart of the representative false claims for the eleven residents below.  The residents listed in this Complaint and in Exhibit A have not been identified here to protect patient privacy. The United States and Tennessee will serve Defendants with an unredacted version of Exhibit A that identifies each resident by name.

SPECIFIC EXAMPLES OF FALSE OR FRAUDULENT
<u>CLAIMS FOR GROSSLY SUBSTANDARD SERVICES</u>

*Resident #1 at Imperial Gardens*

187.     Resident #1, a 61-year-old woman, was admitted to Imperial on August 10, 2012 following a stroke.

188.     Imperial failed to provide Resident #1 with effective infection control from August 10, 2012 through February 12, 2013.  On August 20, 2012, she developed a urinary tract infection (UTI).  On September 1, 2012, there was drainage from her percutaneous endoscopic gastrostomy (PEG) tube that was used to deliver enteral nutrition.  On September 4, 2012, a lab report showed that she had a UTI, her PEG tube still had purulent drainage, and the wound culture from two days before was growing Methicillin-resistant Staphylococcus aureus (MRSA) and other bacteria. After a brief hospitalization due to her infections, Resident #1 returned to Imperial on September 7, 2012.  But, on September 18, 2012, MRSA was still growing in her PEG tube.

189.     On September 22, 2012, Resident #1 was prescribed Bactrim for MRSA wounds. But Imperial failed to give her Bactrim on October 2 and 3, 2012. On October 19, 2012, Resident #1 was prescribed 21 doses of Clindaymycin, a medication used to treat serious bacterial infections. The Medication Administration Records (MAR) documented that she received a dose of this drug on October 19, 2012, but that she did not receive the next dose due on October 20, 2012. Per the nurse's notes that day, the reason why the medication was not administered was that it had not been received from the pharmacy. On October 19, 2012, Resident #1's doctor noted that she had a UTI with MRSA, and on October 25, 2012, she still had a UTI. On November 6, 2012, her doctor noted that Resident #1 now had MRSA in a wound and E coli bacteria in her urine. On November 9, 2012, her doctor noted that there was purulent drainage coming from her PEG tube. That same day, her physician ordered antibiotics for Resident #1. But starting on November 18, 2012, Imperial Gardens failed to administer five doses of the Doxicillin antibiotic that had been ordered for her. On December 10, 2012, Resident #1 was diagnosed with another UTI that was treated with one dose of Ceftriaxone IM and later with Levaquin. During November 2012, Resident #1 included Clostridium difficile infection as an infection among other diagnoses in his orders. The primary symptom of Clostridium difficile infection is diarrhea. Resident #1 experienced diarrhea intermittently during her confinement. On February 22, 2013, the doctor's notes again documented Resident #1 having chronic diarrhea.

190.     Imperial's grossly substandard treatment of her numerous infections and failure to keep her PEG tube free of MRSA caused Resident #1 prolonged pain and suffering.

191.     During the above period, Resident #1 was put in isolation beginning September 2, 2012. After her brief hospitalization ended, Imperial returned Resident #1 to isolation, where she remained until November 3, 2012, which amounts to approximately a two-month period. This

isolation was not medically required to treat Resident #1's various infections and needlessly prevented her from enjoying activities and social contact.

192.    During the period when Resident #1 suffered from infections, Imperial falsely documented certain aspects of her care.  For instance, on September 6, 2012, the nurse's notes charted that she had checked bowel sounds, administered feeding tube placement, and encouraged Resident #1 to rest, even though Resident #1 was actually in the hospital that day so the nurse could not have given the care charted.  On September 8, 2012, Imperial put Resident #1 back in isolation.  However, the nurse's notes said that Resident #1 visited the beauty shop that day, when in actuality residents in isolation were not allowed out of the room and could not have gone to the beauty shop.

193.    In addition to the medication errors during the treatment of Resident #1's UTIs and E coli and MRSA infections, Imperial Gardens made other significant medication errors with Resident #1.  She had been receiving Coumadin, a blood thinner, per her medical orders.  But Imperial Gardens discontinued Resident #1's Coumadin, and her doctor ordered it to restart on November 28, 2012.  However, Imperial then failed to administer her Coumadin from the ordered November 28, 2012 date until December 21, 2012, which is a 22-day period in which the facility failed to give her a prescribed medication.  Per the doctor's notes in her chart, there was no reason for this failure to administer Coumadin, and it placed Resident #1 at a high risk for a recurrent stroke and deep vein thrombosis.  This failure was also one basis for the government survey's Immediate Jeopardy citation.

194.    The surveyors found that Imperial Gardens failed to administer her Atrovent inhaler on October 25, 2012, Levothyroxine on November 22, 2012, Metformin on December 9, 2012,

and her aspirin during the period from October 1, 2012 through January 30, 2013 despite physician orders for these medicines.

195. In addition to its failure to provide basic medical care, Imperial gave substandard hygiene from August 10, 2012 through January 31, 2013. In August 2012, Resident #1's chart reflected that she only received bed baths, which differ from a regular bath or shower. In September 2012, her chart shows that Resident #1 received only one shower. In October and November 2012, her chart shows that she only received bed baths. There were no available charts for December 2012 for Resident #1. In January 2013, the chart records reflect that Resident #1 went 13 days without a bath.

196. Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard and/or worthless services to Resident #1, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by TennCare and Medicare.

197. For the non-existent, grossly substandard and/or worthless services provided to Resident #1, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare and Medicare. Medicare paid claims totaling $51,941 for the dates of service from August 10, 2012 through September 3, 2012 and from September 7, 2012 through November 20, 2012 that were not reimbursable. TennCare paid claims totaling $11,720 for the dates of service from November 21, 2012 through January 30, 2013 that were not reimbursable.

198. For the non-existent, grossly substandard and/or worthless services provided to Resident #1 from January 31, 2013 through March 4, 2013, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare. TennCare paid those claims totaling $5447, of which $4085 was not reimbursable.

199.    If Medicare and TennCare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #1, since those claims violated program requirements that were material to the United States' and Tennessee's payment decisions, and the United States and Tennessee did not get what they bargained for in paying for services that were non-existent, grossly substandard, or worthless. Alternatively, Defendants knew or had reason to know that Medicare and TennCare would not have paid the monies listed above if they had known about the grossly substandard care at the time.

*Resident #2 at Imperial*

200.    Resident #2, a 76-year-old woman, was admitted to Imperial on or about July 20, 2012 after a hospitalization for a knee immobilizer.  Resident #2 had no skin problems or lesions when she was admitted to Imperial.

201.    Resident #2 developed serious pressure ulcers during her stay at Imperial.  On July 21, 2012, the nurse noted that Resident #2 was at high risk for a pressure ulcer.  On July 23, 2012, Resident #2 had stage II ulcers on her right ischium and right hip.

202.    On August 7, 2012, a 5.7 x 4 x 0.5 centimeter pressure ulcer was found on Resident #2's right Achilles area.  The Imperial investigation revealed that this pressure ulcer could have been prevented when her brace was removed, by assessing her leg for friction areas and obtaining orders regarding this removal for skin assessment and cleaning.

203.    On August 8, 2012, Resident #2 had a complicated wound on her right posterior ankle with unstageable black eschar, foul odor, and purulent discharge.  This wound continued to deteriorate and was infected, requiring extensive treatment at the wound care center and the facility through January 13, 2013, including a vacuum-assisted closure (VAC) and surgical excision of the tendon, leaving her with a foot drop.

48

204.    According to the November 19, 2012 state survey, Imperial did not remove Resident #2's leg brace for approximately three weeks, which – when removed – showed that she had a stage IV pressure ulcer.  By January 6, 2013, two stage II pressure ulcers had developed on her buttocks.

205.    According to the February 15, 2013 state survey, Imperial only had treatment nurses since October, so Resident #2 did not receive wound care unless there was an extra person available to provide it and an avoidable pressure sore requiring surgery developed.  Resident #2 had various pressure ulcers from soon after her admission until mid-February 2013.

206.    In addition to Imperial's failure to prevent or treat Resident #2's pressure ulcers, Imperial failed to assess Resident #2's pain or treat it adequately during the entirety of her stay there.  The avoidable pressure ulcer that developed on Resident #2's right lower leg caused her extreme pain from August 2013 through January 2013.  This required more and more narcotic medication, scheduled doses plus additional medication as needed to treat the pain.

207.    Imperial also failed to assess and prevent Resident #2 from getting a contracture, which is an abnormal shortening of muscle tissue.  There was no plan of care to prevent contractures, and they developed in her feet due to her severe pressure ulcer under the brace.

208.    Imperial's July risk assessment incorrectly listed Resident #2 as not being at risk for falls.  But, she fell twice on August 12, 2012 and on November 11, 2013.  There was no plan of care for falls for Resident #2 until January 14, 2013.

209.    There was missing documentation for Resident #2 as well.  Imperial's patient file for her lacked an admission nursing assessment and any skin audits.

210.    Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard and/or worthless services to Resident #2, and falsely or fraudulently represented or

49

certified, or caused to be represented or certified, that such claims were properly payable by TennCare and Medicare.

211.    For the non-existent, grossly substandard and/or worthless services provided to Resident #2, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare and Medicare.  Medicare paid claims totaling $33,890 for the dates of service from July 20, 2012 through October 27, 2012, of which $30,501 was non-reimbursable.  TennCare paid claims totaling $739 for the dates of service from March 7, 2013 through March 20, 2013, of which $665 was not reimbursable.

212.    If Medicare and TennCare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #2, since those claims violated program requirements that were material to the United States' and Tennessee's payment decisions, and the United States and Tennessee did not get what they bargained for in paying for the services that were non-existent, grossly substandard, or worthless. Alternatively, Defendants knew or had reason to know that Medicare and TennCare would not have paid the monies listed above if they had known about the grossly substandard care at the time.

*Resident #3 at Crestview*

213.    Resident #3, a 61-year-old man, was admitted to Crestview on January 12, 2012 from a hospital.  He had psychiatric issues and chronic pain.

214.    On his admission date, the nurses began giving him oxygen.  But there was never a doctor's order for oxygen.  Crestview staff failed to notify a physician of Resident #3's subsequent difficulty maintaining oxygen levels, his changes in behavior, or his edema.

215.    Crestview's plan of care for Resident #3 was inadequate as developed and did not change as resident behaviors developed over the course of the week.  Specifically, on January 13,

50

2012, Resident #3 complained of pain all over. On January 14, 2012, he slept only one or two hours that night and exhibited various abnormal behaviors. By January 15, 2012, the nurse's notes showed that he was agitated and awake all night. Crestview also failed to assess Resident #3's pain or change his plan of care in light of his pain.

216.     Crestview failed to assess Resident #3 accurately or completely. Crestview did not give him a neurological evaluation or properly assess his respiratory status and oxygen levels or his need for assistance with transfers and ambulation.

217.     Resident #3 was suffering from Nicotine withdrawal. But, Crestview did not medically address this by giving him a Nicotine patch until January 17, 2012.

218.     Crestview made medication errors with Resident #3. On January 14, 2012, he did not receive his inhaler as ordered and slept only one or two hours that night. On January 16, 2016, Crestview failed to give Resident #3 his prednisone as ordered.

219.     Crestview failed to provide medical services, social services and psychiatric services to Resident #3.

220.     On January 18, 2012, the nurse's notes showed that Resident #3 was disoriented and that there were crackling sounds heard in his lungs.

221.     On the morning of January 19, 2012, a nurse found Resident #3 dead in his room. The cause of death was listed as a heart attack.

222.     In May 2012, state surveyors cited Crestview for putting Resident #3 in Immediate Jeopardy for failing to provide an environment that was free from accident hazards and failing to provide the necessary care and services to him.

223.     The surveyors also found that Crestview failed to assess Resident #3's status and notify the physician of his conditions, which further placed him in Immediate Jeopardy.

224. Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard, and/or worthless services to Resident #3, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by TennCare.

225. For the non-existent, grossly substandard and/or worthless services provided to Resident #3, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare. TennCare paid claims totaling $2695 for the dates of service from January 12, 2012 through January 18, 2012, which was not reimbursable.

226. If TennCare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #3, since those claims violated program requirements that were material to Tennessee's payment decisions, and Tennessee did not get what they bargained for in paying for the services that were non-existent, grossly substandard, or worthless. Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the grossly substandard care at the time.

*Resident #4 at Boulevard*

227. Resident #4, a 61-year-old man, was admitted to Boulevard on September 19, 2011.

228. On September 27, 2011, Resident #4 weighed 145 pounds. That day, a speech therapist advised that it was unsafe for him to feed himself and that he needed assistance with feeding. However, Boulevard failed to provide for Resident #4's feeding needs, causing him to suffer unintended weight loss. By December 23, 2011, his weight dropped to 126 pounds. By May 7, 2012, he weighed just 123.6 pounds.

229.     From September 20, 2011 until June 14, 2012, Boulevard improperly used a Velcro belt restraint on Resident #4.  There was no signed consent form for using restraints on him during that period, and on October 25, 2011 Boulevard's occupational therapist had recommended a less restrictive restraint be used on Resident #4.  There was also no order for a trunk restraint while in bed, and Boulevard inadequately documented the use of restraints on Resident #4.

230.     From December 2, 2011 until January 19, 2012, Boulevard failed to adequately treat Resident #4's scrotum.  On December 2, 2011, Boulevard documented that he had scrotal swelling that prevented him from being able to sit upright.  On December 4, 2011, the nurse's notes reflect that his scrotum was still swollen.  But Boulevard did not initiate a care plan for this problem until January 11, 2012.

231.     From his admission date until June 13, 2012, Boulevard gave the psychotropic medications Seroquel and Lorazepam to Resident #4.  But Boulevard failed to document any systematic monitoring of the behaviors that required these medications, their efficacy with Resident #4, or their possible side effects.

232.     From May 5, 2012 until his death at Boulevard on June 19, 2012, Boulevard failed to adequately assess and manage Resident #4's pain.  All of Boulevard's MDS assessments stated that he had no pain, which was inaccurate.  On May 5, 2012, the nurse documented that Resident #4 occasionally moaned or groaned, clenched his fists, pulled up his knees, and struck out.    On May 11, 2012, the nurse noted that his scrotum was enlarged and might be infected and have an abscess.  On May 19, 2012, the nurse noted that the resident denied having pain and that the staff should not assess him for pain.  On May 26, 2012, Resident #4 was unable to answer if he had pain, but he again had rigid body language, with clenched fists, knees pulled up and striking out. On June 9, 2012, Resident #4 had similar body language and refused meals.  On June 13, 2012,

the physician ordered Resident #4 receive hospice services. Resident #4's behavior during this period indicated that he was in serious pain, but did not receive treatment for that pain

233.    On June 19, 2012, Resident #4 died at Boulevard without having received the benefit of hospice care to alleviate his pain and suffering.

234.    Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard and/or worthless services to Resident #4, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by TennCare.

235.    For the non-existent, grossly substandard, and/or worthless services provided to Resident #4, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare. TennCare paid claims totaling $2228 for the dates of service from December 2, 2011 through December 15, 2011, of which $1671 was not reimbursable, and claims totaling $7032 for the dates of service from May 5, 2012 through June 18, 2012, all of which was non-reimbursable.

236.    If TennCare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #4, since those claims violated program requirements that were material to Tennessee's payment decisions, and Tennessee did not get what they bargained for in paying for the services that were non-existent, grossly substandard, or worthless. Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the grossly substandard care at the time.

*Resident #5 at Glen Oaks*

237.    Resident #5, a 92-year-old woman, was admitted to Glen Oaks on November 14, 2013 after a fall and hospitalization.

238.     During most of December 2013, Glen Oaks failed to prevent Resident #5 from suffering falls.  On December 8, 2013, she first fell there, but this did not result in a revision to her care plan.  On December 20, 2013, Resident #5 fell and hit her head, causing a laceration and hematoma on her forehead.  On December 26, 2013, she fell again.

239.     Glen Oaks failed to manage Resident #5's pain while she was there and as she was dying.  According to her initial assessment, Resident #5's pain began on November 14, 2013.  On November 17 and 19, 2013, she still had pain. On November 20, 2013, Glen Oaks created her care plan for pain, but did not change that plan later.  There was no scheduled administration of pain medication for her at any point while she was at Glen Oaks.

240.     On December 9, 14, 22, and 26, 2013, records show that Resident #5 still had pain. However, her MDS on December 28, 2013, did not document her as having pain, which is inconsistent with her reported, ongoing pain.

241.     On December 30, 2013, Resident #5 was frequently in pain and had been so for the previous five days, making it hard to sleep and interfering with her daily activities.  On December 31, 2013, Resident #5 had severe hip pain that caused her to yell and cry.

242.     On January 1 through 5, 2014, Glen Oaks administered hydrocodone to Resident #5.  But during this period, she was crying, hurting, yelling, moaning, and grimacing.  On the night of January 5, 2014 and on January 6, 2014, Glen Oaks gave her Roxanol for pain.  But her pain continued, as she screamed and groaned.

243.     On January 7, 2014, Resident #5 was found dead in her room.

244.     Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard and/or worthless services to Resident #5, and falsely or fraudulently represented or

certified, or caused to be represented or certified, that such claims were properly payable by Medicare.

245.    For the non-existent, grossly substandard and/or worthless services provided to Resident #5 from November 14, 2013 through December 7, 2013 and from December 30, 2013 through January 7, 2014, Defendants knowingly submitted or caused to be submitted claims for payment to Medicare.  Medicare paid claims for those dates of service totaling approximately $9370, of which approximately $6560 was not reimbursable.

246.    For the non-existent, grossly substandard and/or worthless services provided to Resident #5 from December 8, 2013 through December 28, 2013, Defendants knowingly submitted or caused to be submitted claims for payment to Medicare.  Medicare paid claims for those dates of service totaling approximately $4615 that was not reimbursable.

247.    If Medicare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #5, since those claims violated program requirements that were material to the United States' payment decisions, and the United States did not get what they bargained for in paying for the services that were non-existent, grossly substandard, or worthless.  Alternatively, Defendants knew or had reason to know that Medicare would not have paid the monies listed above if it had known about the grossly substandard care at the time.

*Resident #6 at Poplar Point*

248.    Resident # 6, a 71-year-old man, was admitted to Poplar Point on November 1, 2010 after a hospitalization.

249.    Poplar Point failed to deliver care that prevented him from falling multiple times during his one month there.  On November 4, 2010, he fell due to low blood sugar.  On November

56

5, 2010, the nurse found him on the floor after another resident reported this. Later that same day, a nurse again found Resident #6 on the floor, this time with his pants around his ankles. On November 15, 2010, Resident #6 tripped and fell on the floor. On November 16, 2010, notes show that due to his increased falls that month, his gait had regressed.

250.    According to an anonymous letter, on November 19, 2010, Resident #6 fell and remained on the floor, naked and covered in a bowel movement, for 70 minutes, while the certified nurse assistant said that she did not have time to attend to him. Poplar Point did not investigate this complaint or otherwise provide Resident #6 his rights in this situation.

251.    Poplar Point failed to treat Resident #6's ongoing pain. After his November 5, 2010 fall, he complained of pain, but did not receive any treatment after the nurse noted "no injury." On November 16, 2010, notes show that he had pain daily, including in his right hip and both legs. On November 17, 2010, the doctor ordered Lortab for pain. On November 19, 2010, the nurse's notes reflected that Resident #6 had pain daily in his left foot and grimaced when he walked, which he did only with a limp. On November 22, 2010, Resident #6 had a pain assessment, reflecting that he had pain daily in his right leg and big toe and grimaced in pain. The next day, Resident #6 had to stop therapy frequently to comment on the pain in his leg. On November 25, 2010, the nurse's notes again showed him to be in pain daily in his right foot and toe. On November 27, 2010, Poplar Point gave him Lorazepam for his agitation and aggression, and afterwards he had no pain. Poplar Point's failure to treat Resident #4's pain caused him suffering.

252.    After increasing Resident #6's dose of Seroquel on November 11, 2010, Poplar Point failed to monitor the effectiveness of this medication and its side effects.

253.    Poplar Point failed to assess Resident #6 for a UTI when he exhibited classic UTI symptoms of frequency of urination and incontinence as documented on November 21, 2010.

254.    On December 1, 2012, Resident #6 was discharged from Poplar Point to another facility.

255.    Defendants knowingly provided, or caused to be provided, non-existent, grossly substandard and/or worthless services to Resident #6, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by Medicare.

256.    For the non-existent, grossly substandard and/or worthless services provided to Resident #6 from November 1, 2010 through November 29, 2010, Defendants knowingly submitted or caused to be submitted claims for payment to Medicare.  Medicare paid claims totaling approximately $10,953 that was not reimbursable.

257.    If Medicare and/or a reasonable person had known about the grossly substandard care at the time, they would not have paid the monies listed above for Resident #6, since those claims violated program requirements that were material to the United States' payment decisions, and the United States did not get what they bargained for in paying for the services that were non-existent, grossly substandard, or worthless.  Alternatively, Defendants knew or had reason to know that Medicare would not have paid the monies listed above if it had known about the grossly substandard care at the time.

SPECIFIC EXAMPLES OF FALSE OR FRAUDULENT
<ins>CLAIMS PREDICATED ON FORGED PAES AND/OR PASSRS</ins>

*Resident #7 at Imperial*

258.    Imperial submitted to Tennessee a PAE certification for Resident #7, a 74-year old woman, on November 12, 2012.  That form contained the forged electronic signature of Nurse B for the upper certification of assessment.

259.    Defendants Vanguard Parent, Vanguard Corporate, Imperial, and Miller knowingly submitted, or caused to be submitted, this forged PAE to Tennessee, and falsely or fraudulently represented or certified, or caused to be represented or certified, that claims for Resident #7 were properly payable by TennCare.

260.    For the non-reimbursable services provided to Resident #7 from January 4, 2013 through March 11, 2013 predicated on her forged PAE, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare.  TennCare paid claims totaling approximately $8050 for these dates of service.

261.    If TennCare and/or a reasonable person had known about the forged PAE, they would not have paid the monies listed above for Resident #7, since those claims violated TennCare requirements that were express conditions of payment and that were material to TennCare payment decisions.  Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the forged PAE at the time.

*Resident #8 at Boulevard*

262.    Boulevard submitted to Tennessee a PAE certification form for Resident #8, a 76-year old man, on March 24, 2014.  That form contained a forged, photocopied physician signature on the physician certification for level of care and a post-dated signature date.

263.    Defendants Vanguard Parent, Vanguard Corporate, Boulevard, and Miller knowingly submitted, or caused to be submitted, this forged PAE to Tennessee, and falsely or fraudulently represented or certified, or caused to be represented or certified, that claims for Resident #8 were properly payable by TennCare.

264.    For the non-reimbursable services provided to Resident #8 from March 16, 2014 through October 13, 2014, Defendants knowingly submitted or caused to be submitted claims for

payment to TennCare. TennCare paid claims totaling approximately $29,760 for these dates of service.

265. If TennCare and/or a reasonable person had known about the forged PAE, they would not have paid the monies listed above for Resident #8, since those claims violated TennCare requirements that were express conditions of payment and that were material to TennCare payment decisions. Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the forged PAE at the time.

*Resident #9 at Glen Oaks*

266. Glen Oaks submitted to Tennessee a PAE certification form for Resident #9, an 85-year old woman, on June 17, 2013. That form contained a forged, photocopied physician signature on the physician certification for level of care and a post-dated signature date.

267. Defendants Vanguard Parent, Vanguard Corporate, Glen Oaks, and Miller knowingly submitted, or caused to be submitted, this forged PAE to Tennessee, and falsely or fraudulently represented or certified, or caused to be represented or certified, that claims for Resident #9 were properly payable by TennCare.

268. For the non-reimbursable services provided to Resident #9 from November 1, 2013 through December 11, 2013, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare. TennCare paid claims totaling approximately $5350 for these dates of service.

269. If TennCare and/or a reasonable person had known about the forged PAE, they would not have paid the monies listed above for Resident #9, since those claims violated TennCare requirements that were express conditions of payment and that were material to TennCare payment

decisions. Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the forged PAE at the time.

*Resident #10 at Manchester*

270.     Manchester submitted to Tennessee a PASRR form for Resident #10, a 75-year old woman, on July 23, 2013, and a PAE certification form on August 9, 2013.   Both forms contained a forged, photocopied physician signature on the physician certification for level of care and a post-dated signature date.

271.     Defendants Vanguard Parent, Vanguard Corporate, Manchester, and Miller knowingly submitted, or caused to be submitted, the forged PAE and PASRR to Tennessee, and falsely or fraudulently represented or certified, or caused to be represented or certified, that claims for Resident #10 were properly payable by TennCare.

272.     For the non-reimbursable services provided to Resident #10 from October 20, 2013 through May 31, 2014, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare.   TennCare paid claims totaling approximately $27,620 for these dates of service.

273.     If TennCare and/or a reasonable person had known about the forged PAE, they would not have paid the monies listed above for Resident #10, since those claims violated TennCare requirements that were express conditions of payment and that were material to TennCare payment decisions.   Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the forged PAE at the time.

*Resident #11 at Poplar Point*

274.     Poplar Point submitted to Tennessee a PAE certification form for Resident #11, a 75-year old woman, on December 4, 2012.  That form contained a forged, photocopied physician signature on the physician certification for level of care and a post-dated signature date.

275.     Defendants Vanguard Parent, Vanguard Corporate, Poplar Point, and Miller knowingly submitted, or caused to be submitted, this forged PAE to Tennessee, and falsely or fraudulently represented or certified, or caused to be represented or certified, that claims for Resident #9 were properly payable by TennCare.

276.     For the non-reimbursable services provided to Resident #11 from April 9, 2013 through November 30, 2013, Defendants knowingly submitted or caused to be submitted claims for payment to TennCare.  TennCare paid claims totaling approximately $43,450 for these dates of service.

277.     If TennCare and/or a reasonable person had known about the forged PAE, they would not have paid the monies listed above for Resident #11, since those claims violated TennCare requirements that were express conditions of payment and that were material to TennCare payment decisions.  Alternatively, Defendants knew or had reason to know that TennCare would not have paid the monies listed above if it had known about the forged PAE at the time.

*Other Residents*

278.     The United States and Tennessee have, and will develop through discovery and further analysis, including expert analysis, additional evidence of Defendants' false or fraudulent claims, representations and certifications, and the United States' and Tennessee's resulting damages.

## WILLIAM ORAND WAS UNJUSTLY ENRICHED BY AND PAID BY MISTAKE
## THROUGH THE VANGUARD DEFENDANTS' UNLAWFUL CONDUCT

279.    Orand is the majority shareholder of Vanguard Parent and controls 60 percent of the company and all Vanguard subsidiaries, including Vanguard Corporate and the Defendant Facilities.

280.    Orand's ownership stake in the Vanguard nursing facilities is arranged through a complex corporate structure and web of related entities that he controls.  He owns his majority stake in the facilities either directly, through Vanguard Parent, or through his Orand Limited Partnership.  Regardless of the particular ownership structure, Vanguard Parent and the Vanguard subsidiaries manage and/or operate all of Orand's Vanguard skilled nursing facilities, and the Vanguard subsidiaries charge the facilities a fee for those services.

281.    During the relevant time period, Orand was the ultimate and primary financial beneficiary of all revenues billed and collected, including Medicare and TennCare funds, by Vanguard Parent and the Vanguard subsidiaries, including the Defendant Vanguard facilities.

282.    Vanguard is operated as a limited liability corporation under the Internal Revenue Code and, therefore, his 60 percent share of Vanguard's income and losses are reported on Orand's personal tax returns and those of his Orand Limited Partnership, and they pass through and are taxed to Orand and his partnership (and the other 40 percent to the minority owner Ervin General Partnership) (rather than at a corporate level).

283.    In 2011, Orand individually received over $3 million in distributions from Vanguard Parent, plus over $360,000 in distributions that were paid to his partnership.

284.    In 2012, Orand individually received over $870,000 in distributions from Vanguard Parent, plus approximately $75,000 in distributions that were paid to his partnership.

285.     In 2013, Orand individually received over $430,000 in distributions from Vanguard Parent.

286.     During all relevant times, Orand failed to respect corporate formalities and operated Vanguard as an instrumentality of his own affairs, by running all of the Vanguard companies as a unitary company that he controlled and dominated out of the Vanguard Brentwood Headquarters.

287.     Vanguard Parent and/or its subsidiaries regularly paid for a leased luxury car for Orand that cost over $20,000 annually.  During certain years, this leased car was a Masserati, and during the 2014-15 period, the leased car was a Mercedes.  More recently, Orand purchased the leased Mercedes, and Vanguard Parent and/or its subsidiaries have paid for the annual purchase fees that approximate close to $20,000 annually.  These car payments have continued even after the Vanguard companies filed for bankruptcy protection.

288.     During at least the 2013 period, Orand caused Vanguard Parent and/or its subsidiaries to pay to lease a rental property in Miami, Florida with an ocean view as a purported second office that Orand frequently visited at company expense, despite the fact that at the relevant time Vanguard only owned a one nursing facility in Florida, which was located almost one hour away, in Boca Raton, Florida.

289.     In 2014, Orand instructed Vanguard Financial to pay him – and he received – guaranteed payments from Vanguard accounts that totaled approximately $600,000, plus the value of the Mercedes lease payments that year.

290.     In 2015, Orand instructed Vanguard Financial to pay him – and he received – guaranteed payments from Vanguard accounts that totaled approximately $600,000, plus the value of the Mercedes lease payments that year.

291.     In 2016 and 2017, Orand instructed Vanguard Financial to pay him – and he received – guaranteed payments from Vanguard accounts that totaled approximately $400,000 each year, plus the value of the Mercedes payments.

292.     In the years 2010 through 2013, Orand received guaranteed payments from Vanguard accounts that similarly totaled approximately hundreds of thousands of dollars each year, plus the value of his car payments.

293.     Upon information and belief, during at least the 2013 period, Orand caused Vanguard Parent and/or its subsidiaries to pay to lease a yacht or large boat that he used that was docked in Florida as well.

294.     As a result of Orand's actions in rendering the Vanguard Defendants jointly liable for the Capital One loan, Orand has left the Vanguard Defendants and the Defendant Facilities grossly undercapitalized.

295.     Ultimately, Orand owns, manages, and sits atop a unitary nursing home business to which Medicare and TennCare have paid billions of dollars, a substantial portion of which were for non-payable skilled nursing services.  Given Orand's ultimate control over the operations of Vanguard as a unitary business and given that he was personally enriched through his Vanguard unitary business while leaving the Vanguard companies grossly undercapitalized, he should not be permitted to retain the proceeds of the Vanguard Defendants' false claims and false statements. Moreover, Orand and related entities hold all such proceeds (including property obtained with those proceeds) in constructive trust for the benefit of the United States and Tennessee; and all such proceeds and property are impressed with an equitable lien for the benefit of the United States and Tennessee.

## MARK MILLER WAS UNJUSTLY ENRICHED BY AND PAID BY MISTAKE
## THROUGH THE VANGUARD DEFENDANTS' UNLAWFUL CONDUCT

296.    Defendant Miller was Vanguard Corporate's Director of Operations from September 2011 through August 2014.

297.    During that period, he received a salary from Vanguard and had bonus opportunities.

298.    Miller was aware of complaints and problems involving PAEs and quality of care at the facilities during this period.

299.    Miller met with Van Nostrand and discussed PAEs shortly before the first Imperial PAE violations occurred.

300.    Miller failed to take steps to prevent similar violations involving physician forgeries at other Vanguard facilities that Miller oversaw through his position as Director of Operations.

301.    Miller consistently pressured facility administrators to drive census, rather than focus on patient care.

302.    Miller ordered the cessation of the use of agency staffing at Imperial in the Summer of 2012, approximately six months before the facility was closed due to grossly substandard care.

303.    Given Miller's high level of direct involvement with the Defendant facilities while he worked at Vanguard, and given that he was unjustly enriched and paid by mistake through his salary and any bonus payments he received from Vanguard, he should not be able to retain the proceeds of those monies that stem from the Vanguard Defendants' false claims and false statements.   Moreover, Miller holds the proceeds of his Vanguard salary and bonuses in constructive trust for the benefit of the United States and Tennessee; and all such proceeds and property are impressed with an equitable lien for the benefit of the United States and Tennessee.

## SUMMARY OF UNITED STATES' AND TENNESSEE'S CLAIMS

304. Vanguard Parent, Vanguard Corporate and Defendant Miller, through their interrelated conduct in the operation of the Defendant Facilities, submitted or caused to be submitted false or fraudulent claims, and false or fraudulent representations and certifications material to such claims, to the TennCare and Medicare programs, for services that were (a) non-existent, grossly substandard and/or worthless, and resulted in significant physical and mental harm to vulnerable elderly, disabled and low income residents of the Grossly Substandard Defendant Facilities and (b) predicated upon PAEs and/or PASRRs with forged certification signatures that rendered those services from Imperial and the Physician Forgery Defendant Facilities non-payable by TennCare.

305. Despite Defendants' knowledge, reckless disregard, or deliberate ignorance of (a) the fact that resident care at the Grossly Substandard Defendant Facilities was non-existent, grossly substandard and/or worthless, and the residents were, as the result, suffering significant physical and mental harm, and (b) the forged certification signatures on PAEs and PASRRs at Imperial and the Physician Forgery Defendant Facilities, Defendants knowingly made, or caused to be made, and received and retained payments for, false and fraudulent claims for the bundle of nursing home services that the Defendants were required to provide as a TennCare and Medicare provider.

306. Defendants knowingly made, or caused to be made, false and fraudulent statements material to their false or fraudulent claims to the TennCare and Medicare programs, and knowingly received and retained TennCare and Medicare funds to which they were not entitled.

307. The TennCare and Medicare programs mistakenly paid for Defendants' (a) non-existent, grossly substandard and/or worthless services and (b) services predicated upon PAEs and PASRRs that in fact contained forged certification signatures.

308.    Orand and Miller were unjustly enriched by – and paid by mistake through – their receipt of monetary benefits that they knowingly received where, as here, circumstances make it inequitable for them to retain these funds.

309.    The United States and Tennessee were damaged and Defendants were unjustly enriched by the payments they sought and received from the TennCare and Medicare programs for the (a) non-existent, grossly substandard and/or worthless services Defendants provided, or caused to be provided and (b) services predicated upon PAEs and PASRRs with forged certification signatures.

310.    The United States and Tennessee are entitled to recover their damages, and in equity, fairness and good conscience, Defendants should be required to account for and disgorge such unjustly obtained amounts.

<u>COUNTS</u>

311.    All counts are for the following time periods:

| Defendant | Dates of Service with this Period |
|---|---|
| Vanguard Corporate<br>Vanguard of Crestview, LLC<br>Glen Oaks, LLC<br>Vanguard of Memphis, LLC | 1/1/10 – 12/31/15 |
| Vanguard Parent | 6/1/10 – 12/31/15 |
| Imperial Gardens Health and Rehabilitation, LLC | 1/1/10  – 4/30/13 |
| Boulevard Terrace, LLC | 1/1/11 – 12/31/15 |
| Vanguard of Manchester, LLC | 7/1/13  – 4/30/14 |
| Orand | 6/1/11 – 12/31/15 |
| Miller | 10/1/11  – 7/31/14 |

<u>Count I: False Claims Act, 31 U.S.C. 3729(a)(1)(A)</u>

(Against Vanguard Defendants and Miller)

312.    The United States restates and incorporates by reference paragraphs 1 through 311 as if fully set forth herein.

68

313. The Vanguard Defendants and Miller knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the TennCare and Medicare programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

314. Pursuant to the FCA, the Vanguard Defendants and Miller are jointly and severally liable to the United States for its damages resulting from such false claims, in an amount to be determined at trial, trebled, plus civil penalties of between $5,500 and $11,000 for each violation.

<u>Count II: False Claims Act, 31 U.S.C. § 3729(a)(1)(B)</u>

(Against Vanguard Defendants and Miller)

315. The United States restates and incorporates by reference paragraphs 1 through 314 as if fully set forth herein.

316. The Vanguard Defendants and Miller knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, § 3729(a)(1)(B), including false Minimum Data Sets.

317. Pursuant to the FCA, the Vanguard Defendants and Miller are jointly and severally liable to the United States for its damages resulting from such false records and statements, in an amount to be determined at trial, trebled, plus civil penalties of between $5,500 and $11,000 for each violation.

<u>Count III:  Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A)</u>

(Against Vanguard Defendants and Miller)

318. Tennessee restates and incorporates by reference paragraphs 1 through 317 above.

319. The Vanguard Defendants and Miller knowingly presented, or with reckless disregard presented, or caused to be presented, false or fraudulent claims for payment or approval

under the TennCare/Medicaid program, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(A).

320.     As a result of the false or fraudulent claims that these Defendants presented, or caused to be presented to TennCare, the State has suffered damages and is entitled to and requests treble damages under the Tennessee Medicaid False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each violation.

<u>Count IV: Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B)</u>

(Against Vanguard Defendants and Miller)

321.     Tennessee restates and incorporates by reference paragraphs 1 through 320 above.

322.     The Vanguard Defendants and Miller knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim under the TennCare/Medicaid program, in violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182(a)(1)(B), including false Minimum Data Sets, PAEs and PASRRs.

323.     As a result of the false records or statements that these Defendants made or used, or caused to be made or used, to TennCare, the State has suffered damages and is entitled to and requests treble damages under the Tennessee Medicaid False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each violation.

<u>Count V: Payment by Mistake</u>

(Against Vanguard Defendants, Orand, and Miller)

324.     The United States and Tennessee restate and incorporate by reference paragraphs 1 through 323 as if fully set forth herein.

325.     This is a claim for the recovery of monies paid by the United States and Tennessee to the Vanguard Defendants, Orand, and Miller for their benefit and the benefit of the other

70

Defendants, as the result of mistaken understandings of fact. The false claims that these Defendants submitted or caused to be submitted to the TennCare and Medicare programs were paid based upon mistaken or erroneous understandings of material fact.

326.     The TennCare and Medicare programs, without knowledge of the falsity of the claims, representations and certifications that defendants made, or caused to be made, mistakenly paid Defendants certain sums of federal and state monies to which these Defendants were not entitled.

327.     The Vanguard Defendants, Orand, and Miller are liable to account for and to repay such amounts to the United States and Tennessee, in an amount to be determined at trial.

Count VI:  Unjust Enrichment

(Against Vanguard Defendants, Orand, and Miller)

328.     The United States and Tennessee restate and incorporate by reference paragraphs 1 through 327 as if fully set forth herein.

329.     Defendants wrongfully received and retained the benefit of federal and state monies paid from the TennCare and Medicare programs for nursing home services provided (a) to the Grossly Substandard Defendant Facilities' residents that were non-existent, grossly substandard, and/or worthless, and resulted in serious physical and emotional harm to such vulnerable, elderly, disabled and low-income residents, and/or (b) to Imperial's and the Physician Forgery Defendant Facilities' residents predicated upon PAEs and/or PASRRs with forged certification signatures.

330.     Defendants were unjustly enriched with federal and state monies from the TennCare and Medicare programs, which Defendants should not in equity and good conscience be permitted to retain, and which Defendants should account for and disgorge to the United States and Tennessee, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Tennessee pray for judgment against Defendants as follows:

A.      With respect to Counts I and II brought pursuant to the FCA, that judgment be entered against the Vanguard Defendants and Miller jointly and severally, in the amount to be determined at trial, trebled, plus civil penalties of $5,500 to $11,000 for each violation;

B.      With respect to Counts III and IV brought pursuant to the TMFCA, that judgment be entered against the Vanguard Defendants and Miller jointly and severally, in the amounts to be determined at trial, trebled, plus such civil penalties as are required by law

C.      With respect to Count V for payment by mistake, that judgment be entered against the Defendants jointly and severally, in the amounts to be determined at trial by which these Defendants were mistakenly paid;

D.      With respect to Count VI for unjust enrichment, that judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial by which the Defendants were unjustly and unlawfully enriched; and

E.      With respect to each Count, that the United States and Tennessee be afforded interest, attorney's fees and costs as allowed by law, and any and all further relief as the Court deems just and proper.

The United States and Tennessee demand a trial by jury on all issues so triable.

Dated: May 30, 2017                    Respectfully Submitted,

For the United States:                 CHAD A. READLER
                                       Acting Assistant Attorney General
                                       Civil Division


                            By:      s/Susan Lynch_____
                                     MICHAEL D. GRANSTON
                                     ANDY MAO
                                     SUSAN LYNCH
                                     BRETT ELLIOTT
                                     Attorneys, Civil Division
                                     U.S. Department of Justice
                                     P.O. Box 261, Ben Franklin Station
                                     Washington, DC  20044
                                     Telephone: (202) 353-7171
                                     Fax: (202) 514-7361
                                     Email:  Susan.Lynch@usdoj.gov

                                     JACK SMITH
                                     Acting United States Attorney
                                     Middle District of Tennessee


                            By:      s/Ellen Bowden McIntyre___
                                     ELLEN BOWDEN MCINTYRE
                                     BPR #023133
                                     Assistant United States Attorney
                                     United States Attorney's Office
                                     110 Ninth Avenue South, Suite A-961
                                     Nashville, TN  37203
                                     Phone: (615) 736-5151
                                     Fax: (615) 401-6626
                                     Email:  Ellen.Bowden2@usdoj.gov

For the State of Tennessee:         s/Herbert H. Slatery III
HERBERT H. SLATERY III
BPR #009077
Attorney General & Reporter
PHILIP H. BANGLE, BPR 031636
Assistant Attorney General
Medicaid Fraud & Integrity Division
Tennessee Attorney General's Office
425 Fifth Avenue North
Nashville, TN 37243
Telephone: 615-741-3054
Fax: 615-741-6421
Philip.Bangle@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May, 2017, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following, if registered, by operation of the Court's electronic filing system.  If not registered, notice was mailed by regular U.S. mail to:

| | |
|---|---|
| John H. Rowland<br>Christy T. Crider<br>Jaime L. DeRensis<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>Baker Donelson Center<br>211 Commerce Street, Suite 800<br>Nashville, TN  37201 | G. Douglas Jones<br>Jones & Hawley, PC<br>2001 Park Place, Suite 830<br>Birmingham, AL  35203 |
| William L. Norton, III<br>Ty E. Howard<br>Fritz Spainhour<br>Bradley Arant Boult Cummings, LLP<br>1600 Division Street, Suite 700<br>Nashville, TN  37203 | Sarah B. Jackson<br>3817 Glencoe Drive<br>Birmingham, AL 35213 |
| Hal Hardin<br>Hardin Law Office<br>211 Union Street, Suite 200<br>Nashville, TN  37201 | |

 s/Ellen Bowden McIntyre
ELLEN BOWDEN MCINTYRE
Assistant United States Attorney